**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ROBERT WOJCIK, derivatively on behalf of OMEGA HEALTHCARE INVESTORS, INC., | C.A. No. _____ |
| c/o Nikoletta S. Mendrinos Esq.<br>Murphy, Falcon & Murphy<br>1 South Street<br>30th Floor<br>Baltimore, Maryland 21202 | **DEMAND FOR JURY TRIAL** |
| *Plaintiff*, | |
| v. | |
| OMEGA HEALTHCARE INVESTORS, INC.,<br>200 International Circle,<br>Suite 300<br>Hunt Valley, MD 21030 | |
| Serve on:<br>THE CORPORATION TRUST, INC.<br>2405 York Road<br>Suite 201<br>Lutherville Timonium,<br>Maryland 21093 | |
| and | |
| C. TAYLOR PICKETT<br>c/o Omega Healthcare Investors, Inc.<br>200 International Circle,<br>Suite 300<br>Hunt Valley, MD 21030 | |
| Serve on:<br>THE CORPORATION TRUST, INC.<br>2405 York Road<br>Suite 201<br>Lutherville Timonium,<br>Maryland 21093 | |
| and | |

ROBERT O. STEPHENSON
c/o Omega Healthcare Investors, Inc.
200 International Circle,
Suite 300
Hunt Valley, MD 21030

       Serve on:
       THE CORPORATION TRUST, INC.
       2405 York Road
       Suite 201
       Lutherville Timonium,
       Maryland 21093

and

DANIEL J. BOOTH
c/o Omega Healthcare Investors, Inc.
200 International Circle,
Suite 300
Hunt Valley, MD 21030

       Serve on:
       THE CORPORATION TRUST, INC.
       2405 York Road
       Suite 201
       Lutherville Timonium,
       Maryland 21093

and

CRAIG M. BERNFIELD
c/o Omega Healthcare Investors, Inc.
200 International Circle,
Suite 300
Hunt Valley, MD 21030

       Serve on:
       THE CORPORATION TRUST, INC.
       2405 York Road
       Suite 201
       Lutherville Timonium,
       Maryland 21093

and

NORMAN R. BOBINS
c/o Omega Healthcare Investors, Inc.
200 International Circle,
Suite 300
Hunt Valley, MD 21030

      Serve on:
      THE CORPORATION TRUST, INC.
      2405 York Road
      Suite 201
      Lutherville Timonium,
      Maryland 21093

and

CRAIG R. CALLEN
c/o Omega Healthcare Investors, Inc.
200 International Circle,
Suite 300
Hunt Valley, MD 21030

      Serve on:
      THE CORPORATION TRUST, INC.
      2405 York Road
      Suite 201
      Lutherville Timonium,
      Maryland 21093

and

BARBARA B. HILL
c/o Omega Healthcare Investors, Inc.
200 International Circle,
Suite 300
Hunt Valley, MD 21030

      Serve on:
      THE CORPORATION TRUST, INC.
      2405 York Road
      Suite 201
      Lutherville Timonium,
      Maryland 21093

and

HAROLD J. KLOOSTERMAN
c/o Omega Healthcare Investors, Inc.
200 International Circle,
Suite 300
Hunt Valley, MD 21030

       Serve on:
       THE CORPORATION TRUST, INC.
       2405 York Road
       Suite 201
       Lutherville Timonium,
       Maryland 21093

and

BERNARD J. KORMAN
c/o Omega Healthcare Investors, Inc.
200 International Circle,
Suite 300
Hunt Valley, MD 21030

       Serve on:
       THE CORPORATION TRUST, INC.
       2405 York Road
       Suite 201
       Lutherville Timonium,
       Maryland 21093

and

EDWARD LOWENTHAL
c/o Omega Healthcare Investors, Inc.
200 International Circle,
Suite 300
Hunt Valley, MD 21030

       Serve on:
       THE CORPORATION TRUST, INC.
       2405 York Road
       Suite 201
       Lutherville Timonium,
       Maryland 21093

and

BEN W. PERKS
c/o Omega Healthcare Investors, Inc.
200 International Circle,
Suite 300
Hunt Valley, MD 21030

       Serve on:
       THE CORPORATION TRUST, INC.
       2405 York Road
       Suite 201
       Lutherville Timonium,
       Maryland 21093

and

STEPHEN D. PLAVIN
c/o Omega Healthcare Investors, Inc.
200 International Circle,
Suite 300
Hunt Valley, MD 21030

       Serve on:
       THE CORPORATION TRUST, INC.
       2405 York Road
       Suite 201
       Lutherville Timonium,
       Maryland 21093

and

KAPILA K. ANAND
c/o Omega Healthcare Investors, Inc.
200 International Circle,
Suite 300
Hunt Valley, MD 21030

       Serve on:
       THE CORPORATION TRUST, INC.
       2405 York Road
       Suite 201
       Lutherville Timonium,
       Maryland 21093

and

BURKE W. WHITMAN
c/o Omega Healthcare Investors, Inc.
200 International Circle,
Suite 300
Hunt Valley, MD 21030

 Serve on:
 THE CORPORATION TRUST, INC.
 2405 York Road
 Suite 201
 Lutherville Timonium,
 Maryland 21093

 *Defendants.*

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

 Plaintiff Robert Wojcik ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Omega Healthcare Investors, Inc. ("Omega" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants C. Taylor Pickett, Robert O. Stephenson, Daniel J. Booth, Craig M. Bernfield, Norman R. Bobins, Craig R. Callen, Barbara B. Hill, Harold J. Kloosterman, Bernard J. Korman, Edward Lowenthal, Ben W. Perks, Stephen D. Plavin, Kapila K. Anand, and Burke W. Whitman (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Omega, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements

made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Omega, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a shareholder derivative action that seeks to remedy wrongdoing committed by Omega's directors and officers from February 8, 2017 through the present (the "Relevant Period").

2.       Omega is a real estate investment trust which invests in healthcare facilities, such as skilled nursing and senior care facilities, in the United States and the United Kingdom. Omega either owns the properties and leases them to facility operators, or it provides operators with mortgage financing. The Company's "operators" provide care for patients and maintain such facilities. Omega reports its financial performance to the market through its Funds from Operations ("FFO") and adjusted FFO metrics. Omega's FFO primarily reflects rents paid by its operators.

3.       At the beginning of the Relevant Period, 4 West Holdings, Inc., otherwise known as Orianna Health Systems ("Orianna")[1] was the Company's second largest operator, operating 59 skilled nursing facilities across the country which represented approximately 7% of Omega's investment portfolio at that time, totaling approximately $619 million in gross investment. By late 2016 and early 2017, Orianna began to experience serious financial troubles and became delinquent on its rent.

---

[1] Orianna is also identified in Omega's public filings with the SEC as "New ARK Investments, Inc.," the name of its affiliate.

4.       Nonetheless, on February 8, 2017, the Company issued a press release titled "Omega Announces Fourth Quarter 2016 Financial Results; New Investments and Increased Dividend for 18th Consecutive Quarter," which announced a quarterly dividend of $0.62 per share.

5.       That press release indicated strong financial results, including $900.8 million in operating revenues, and $660.1 million in funds from operations—a nearly 45% increase over the same quarter of the prior year. Based on these results, the Company expected its adjusted FFO to be $3.40 to $3.44 per share in 2017.

6.       In response to Orianna's liquidity issues and grave financial condition, the Individual Defendants caused Omega to intervene to attempt to stabilize Orianna's commercial viability. Consequently, unbeknownst to the investing public, the Individual Defendants caused the Company to make a working capital loan in the amount of $15 million to Orianna on May 2, 2017 (the "Working Capital Loan").

7.       Two days after the Company made the Working Capital Loan to Omega, the Company held a conference call in connection to financial results for the first quarter of 2017. However, during the call, the Individual Defendants caused the Company to fail to reveal not only the full extent of Orianna's financial trouble but also the existence of the Working Capital Loan. Instead, Defendants C. Taylor Pickett ("Pickett"), the Company's Chief Executive Officer ("CEO"), and Defendant Daniel J. Booth ("Booth"), Omega's Chief Operating Officer ("COO"), painted an overly optimistic picture for Orianna's future and, in turn, failed to reveal the Company's actual anticipated impact of Orianna's financial struggles on Omega.

8.       Despite Orianna's continued financial instability, the Company issued a press release on July 26, 2017 in which Omega revised guidance on FFO upwards between $3.42 and $3.44 "per diluted share."

9.      The next day, on July 27, 2017, the Company held an earnings call regarding its financial results for the quarter ended June 30, 2017. Prior to the call, analysts had raised concerns regarding Orianna's ability to pay rent to Omega. During that call, Defendant Booth noted that the Company "continue[s] to see certain regional operators struggle with various operational pressures" and stated that two of Omega's top ten operators had seen a decline in coverages and margins, which created liquidity concerns. However, Defendant Booth also continued to project an "optimistic" view that coverages had stabilized and Orianna's efforts would result in "steadily improving margins" and "eventually return to its former profitability." Again, the Company failed to disclose the existence of the Working Capital Loan.

10.     Following these releases, Omega's stock price fell $1.35 per share, or 4%, to close at $32.10 per share on July 27, 2017, on unusually heavy trading volume.

11.     After markets closed on October 30, 2017, the Company issued a press release which contained its third quarter 2017 financial results and announced reduced guidance and issues with one of the Company's top ten operators.

12.     The following day, Omega held a conference call discussing those results. On the call, Defendant Booth stated that "we continue to experience specific operator performance issues" which were affecting two of the Company's top ten operators, Orianna and Signature Healthcare, due to "liquidity issues [that] are impacting the ability of these operators to pay rent on a timely basis."

13.     On the same call, Chief Financial Officer ("CFO") Defendant Robert O. Stephenson ("Stephenson") stated "[o]perating revenue for the quarter was approximately $220 million versus $225 million for the third quarter of 2016." "The decrease was primarily a result of placing Orianna on a cash basis" causing Company to record no Orianna revenue for the quarter.

He further explained that due in part to "the temporary loss of Orianna revenue for both the third and fourth quarters" and the fact that the Company "placed a non-top ten operator," Daybreak, "on a cash basis effective September 1st," the Company had "lowered [its] 2017 adjusted FFO guidance to $3.27 to $3.28 per share."

14.     On this news, the Company's stock price fell $2.11 per share, or 6.8%, to close at $28.86 per share on October 31, 2017, on unusually heavy trading volume.

15.     Then, on November 7, 2017, the Company filed its quarterly report for the third fiscal quarter ended September 30, 2017 which noted that Omega had restructured two of Orianna's direct financing leases, resulting in impairments totaling $20.8 million, that Orianna had failed to satisfy contractual payments due under the terms of the remaining two direct financing leases or the separate operating lease with Omega and the collectability of future amounts due is "uncertain." Orianna filed a chapter 11 bankruptcy petition on March 6, 2018.

16.     From February 8, 2017 through October 31, 2017, the investing public was under a false impression of the Company's business, operations, and financial success.

17.     From February 8, 2017 through October 31, 2017, the Individual Defendants, in breach of their fiduciary duties owed to Omega, willfully or recklessly made and/or caused the Company to make false and/or misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose: (1) the deteriorating financial and operating results of certain of Omega's operators, including Orianna; (2) the resulting diminished liquidity of those operators, including Orianna, and its impact on their ability to make timely rent payments; (3) that as a result, certain of Omega's direct financing leases were impaired and certain receivables were uncollectible; (4) the Individual Defendants caused Omega to become

directly involved in Orianna's attempt to stabilize its financial condition and, as a result, Omega provided the Working Capital Loan to Orianna; (5) thereafter, whatever rent payments Orianna made to Omega was a direct result from the monies Orianna received from the Working Capital Loan that Omega provided to Orianna; and (6) that Omega failed to maintain internal controls; and (7) that due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and/or lacked a reasonable basis in fact.

18.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact relating to Orianna's financial condition and the Working Capital Loan, rendering them personally liable to the Company for breaching their fiduciary duties.

19.     Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain internal controls.

20.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its CEO, its CFO, and its COO to two federal securities fraud class action lawsuits which have been consolidated into one action which is pending in the United States District Court for the Southern District of New York (the "Securities Class Action"),[2] the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company and who received proceeds of insider sales, costing the Company millions of dollars.

---

[2] Specifically, the Securities Class Action names Defendants Pickett, Stephenson, and Booth as defendants.

21.     In the Securities Class Action, the United States Court of Appeals for the  Second Circuit reversed the District Court's order, which granted the defendants Omega, Pickett, Booth, and Defendant Stephenson's motion to dismiss the Consolidated Amended Class Action Complaint (the "Amended Complaint")[3], and remanded the case to the district court for further proceedings on August 3, 2020, finding that the defendants' repeated failure to disclose the working capital loan in the amount of $15 million made by Omega to Orianna on May 2, 2017, and statements surrounding Orianna's financial condition from that date until October 31, 2017 were false and misleading. *See* Securities Class Action Order at 21-24, *In re: Omega Healthcare Investors, Inc.*, Case No. 19-cv-1095 (2d Cir. 2020), Dkt. No. 55-1, reversing and remanding *In re: Omega Healthcare Investors, Inc.*, Case No. 1:17-cv-08983-NRB (S.D.N.Y. March 25, 2019), Dkt. No. 62 ("Securities Class Action Order").

22.     The Court of Appeals held that the Amended Complaint filed in the Securities Class Action on May 25, 2018, sufficiently pleaded that defendants were duty-bound to disclose the Working Capital Loan, stating the following:

> Omega's duty to disclose the Loan arose directly from Rule 10b–5's requirement to disclose "material fact[s] necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b); see also Stratte-McClure, 776 F.3d at 101 ("[A] duty [to disclose omitted facts] may arise when there is . . . a corporate statement that would otherwise be inaccurate, incomplete, or misleading." (internal quotation marks and citation omitted)). A review of Defendants' statements makes clear that, without disclosing the existence of the Loan, Defendants' statements regarding Orianna's rent payments gave a false impression of the financial health of one of Omega's largest assets.

---

[3] On August 28, 2020, with the Court's permission, lead plaintiff in the Securities Class Action filed a Second Consolidated Amended Class Action Complaint ("SAC") which extended the Class Period to include shareholders who acquired the Company's securities between February 8, 2017 and October 31, 2017. Defendants in the Securities Class Action filed a motion to dismiss the SAC on November 24, 2020, which is pending before the court.

On May 4, 2017, Defendants told analysts and investors that, as of March 31, 2017, Orianna was "45 days past due" on its rental payments. Defendants later indicated that, as of June 30, 2017, Orianna was "approximately 90 days past due on rent payments," but that it was "currently making partial monthly rent payments." By failing to disclose that the Loan accounted for all (or most) of Orianna's "partial monthly rent payments." Defendants effectively communicated that, notwithstanding any disclosures regarding Orianna's performance issues, Orianna could pay more than half of its rent from its earnings. The omission concealed the extent of Orianna's solvency problems: Orianna could not pay rent without borrowing from its landlord. Under the facts as alleged, because in July 2017 Omega had stated that Orianna was making "partial monthly payments," Omega was duty-bound to disclose that its loan was the source of Orianna's rent payments.

*Id.* at 19-20 (internal citations omitted, and emphasis added).

23.     Moreover, the Court of Appeals found that the allegations in the Amended Complaint upheld a strong inference of scienter as to Defendants Pickett, Booth, and Stephenson, stating the following:

The question is: Was Omega's decision not to disclose the Loan—in the context of its disclosures regarding Orianna's financial health—a sufficiently extreme departure from the standards of ordinary care to satisfy the PSLRA's requirement for showing recklessness?

It was….

*     *     *

Here, the allegations in the Complaint raise a strong inference that Defendants acted, at the very least, recklessly in choosing to disclose incomplete and misleading information regarding Orianna. As the district court noted, there is no question that the inability of one of Omega's "top" tenants to pay rent absent the Loan was material. Orianna represented seven percent of Omega's investment portfolio; it was a significant source of income through rental payments. Orianna's performance plainly impacted Omega's overall financial health; Omega had to know that revealing the full extent of Orianna's performance problems would have been troubling news to its investors.

Moreover, assuming most of the Loan proceeds were used to pay Orianna's rent during the second quarter—as the Complaint alleges—Omega knew that its money would be going directly back into its FFO and/or AFFO. Nevertheless, Defendants chose to represent these numbers as "partial monthly payments" indicating that Orianna was on the road to recovery. The facts as alleged create a compelling inference that Defendants made a conscious decision to not disclose

13

the Loan in order to understate the extent of Orianna's financial difficulties. This is especially convincing where multiple analysts homed in on Orianna's rental payments being key to Omega's prospects.

*Id.* at 21-24 (internal citations omitted, and emphasis added).

24.     As named defendants in the Securities Class Action, Defendants Pickett, Stephenson, and Booth are liable to Omega for contribution under Sections 10(b) and 21D of the Exchange Act if and when the Company is found liable in the Securities Class Action.

25.     Only half a century ago almost every single board of directors in America was solely comprised of Caucasian males. Since, most corporations have made gradual but steady progress to realize more diversified representation on their boards and within their executive management team.

26.     In a recent post, published by *Calvert Research and Management* following civil unrest that coincided the killing of George Floyd, among others, John Streur stated the following, in relevant part:

We are a country suffering from racial inequality. And we want the inequality and suffering to end. Enough people agree with these points that this issue has become a matter that will impact every corporation doing business in this country. Companies that are capable of understanding their roles in taking effective action to end inequality will benefit operationally and reputationally; those that refuse to acknowledge their exposure to this massive problem or that are incapable of swift and effective action will struggle to maintain their competitive positions as employers and with consumers.

27.     Notwithstanding this societal imperative, while other companies have been dedicated to achieving a significant increase in diversity within their highest ranks, the Individual Defendants have caused the Omega to violate federal and state laws regarding diversity and discrimination by repeatedly refusing to nominate, appoint, and/or hire Black individuals to the Board of Directors (the "Board") or Omega's executive management team (the "Discriminatory

Misconduct"). That is to say, zero black individuals reside on the Company's Board or work on the Company's executive management team.

28.     Recently, beginning in 2019, the Company has attempted to save face by incorporating a section in its recent proxy statements related to "Board Diversity" in which the Company purports to consider race as a relevant factor in identifying nominees to serve on its Board. However, contrary to the foregoing and in violation of the Company's stated antidiscrimination policies and certain federal and state laws, the Individual Defendants have caused the Company to make no real efforts to promote diversity on its Board and among its senior executives. In fact, the word "diversity" barely appears in the Company's SEC filings, website, and governance documents unless it is being used to refer to the Company's investment portfolio.

29.     Therefore, in further breach of their fiduciary duties, the Individual Defendants permitted the Discriminatory Misconduct, engaged in and caused the Company to engage in the Discriminatory Misconduct, and failed to maintain adequate controls.

30.     Moreover, the Individual Defendants have deceived investors by claiming to abide by certain antidiscrimination policies. Thus, by engaging gin the Discriminatory Misconduct, the Individual Defendants have breached their duty of candor and have also violated the federal securities laws.

31.     Not only is the Discriminatory Misconduct immoral and illegal, it is also against the best interest of the Company since the companies with the most ethnically or culturally diverse boards worldwide were 43% more likely to experience higher profits, according to a McKinsey report.

32.     The Individual Defendants caused the Company to violate Section 14(a) Exchange Act since the Proxy Statements (defined below) were false and misleading, for among other

reasons, in that they failed to disclose, *inter alia*: (1) the Company had engaged in the Discriminatory Misconduct; and (2) the Company does not have term limits due to a desire to keep Black individuals off of the Board; (3) the Company's Nominating and Corporate Governance Committee did not actually consider racial diversity when nominating Board candidates, and (4) the Company failed to maintain adequate internal controls.

33.     The Company has been substantially damaged because of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

34.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of one of the directors' liability in the Securities Class Action, of their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the federal Securities Class Action based on violations of the Exchange Act.

36.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

37.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

38.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

39.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

40.     Venue is proper in this District because Omega is incorporated and headquartered in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

41.     Plaintiff is a current shareholder of Omega. Plaintiff has continuously held Omega common stock at all relevant times.

**Nominal Defendant Omega**

42.     Omega is a Maryland corporation with its principal executive offices at 303 International Circle, Suite 200, Hunt Valley, MD 21030. Omega's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "OHI."

**Defendant Pickett**

43.     Defendant Pickett has served as the Company's CEO since June 2001 and has served as a Company director since May 2002. Defendant Pickett also serves as a member of the Company's Investment Committee. According to the Company's Schedule 14A filed with the SEC

on April 28, 2020 (the "2020 Proxy Statement"), as of April 13, 2020, Defendant Pickett beneficially owned 180,456 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $33.77, Defendant Pickett owned approximately $6.1 million worth of Omega stock.

44.     For the fiscal year ended December 31, 2019, Defendant Pickett received $7,287,348 in compensation from the Company. This included $799,800 in salary, a $432,012 bonus, $5,190,748 in stock awards, $847,988 in non-equity incentive plan compensation, and $16,800 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Pickett received $6,582,323 in compensation from the Company. This included $780,300 in salary, a $468,154 bonus, $4,681,523 in stock awards, $635,846 in non-equity incentive plan compensation, and $16,500 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Pickett received $5,983,244 in compensation from the Company. This included $765,000 in salary, a $612,000 bonus, $4,590,044 in stock awards, and $16,200 in all other compensation.

45.     The Company's 2020 Proxy Statement stated the following about Defendant Pickett:

> As Chief Executive Officer of the Company, Mr. Pickett brings to the Board a depth of understanding of our business and operations, as well as financial expertise in long-term healthcare services, mergers and acquisitions. Mr. Pickett has served as Chief Executive Officer of the Company since 2001 and as Director of the Company since May 2002. Mr. Pickett has also served as a member of the board of trustees of Corporate Office Properties Trust (NYSE: OFC), an office REIT focusing on U.S. government agencies and defense contractors, since November 2013. From 1993 to June 2001, Mr. Pickett served as a member of the senior management team of Integrated Health Services, Inc. (IHS), most recently as Executive Vice President and Chief Financial Officer. Prior to joining IHS, Mr. Pickett held various positions at PHH Corporation and KPMG Peat Marwick.

**Defendant Booth**

46.     Defendant Booth has served as the Company's COO since October 2001. According to the 2020 Proxy Statement, as of April 13, 2020, Defendant Booth beneficially owned 162,453 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $33.77, Defendant Booth owned approximately $5.5 million worth of Omega stock.

47.     For the fiscal year ended December 31, 2019, Defendant Booth received $3,507,999 in compensation from the Company. This included $517,200 in salary, a $124,239 bonus, $2,559,999 in stock awards, $289,761 in non-equity incentive plan compensation, and $16,800 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Booth received $3,398,646 in compensation from the Company. This included $504,600 in salary, a $154,633 bonus, $2,497,546 in stock awards, $225,367 in non-equity incentive plan compensation, and $16,500 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Booth received $3,156,805 in compensation from the Company. This included $494,700 in salary, a $197,880 bonus, $2,448,025 in stock awards, and $16,200 in all other compensation.

48.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Booth made no purchases of Company stock and sold 20,000 shares of Company stock on June 26, 2017 for $34.65 per share, from which he benefited in the amount of approximately $693,000. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

49.     The Company's Form 10-K for the fiscal year ended December 31, 2019, filed with the SEC on February 28, 2020 (the "2019 10-K") stated the following about Defendant Booth:

*Daniel J. Booth* (56) is our Chief Operating Officer and has served in this capacity since October 2001. From 1993 to October 2001, Mr. Booth served as a member of the management team of Integrated Health Services, Inc., most recently serving as Senior Vice President, Finance. Prior to joining Integrated Health Services, Inc., Mr. Booth served as a Vice President in the Healthcare Lending Division of Maryland National Bank (now Bank of America).[4]

**Defendant Stephenson**

50.     Defendant Stephenson has served as the Company's CFO since August 2001. According to the 2020 Proxy Statement, as of April 13, 2020, Defendant Stephenson beneficially owned 235,122 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $33.77, Defendant Stephenson owned over $7.9 million worth of Omega stock.

51.     For the fiscal year ended December 31, 2019, Defendant Stephenson received $3,149,952 in compensation from the Company. This included $495,500 in salary, a $119,172 bonus, $2,240,252 in stock awards, $277,828 in non-equity incentive plan compensation, and $16,800 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Stephenson received $3,051,830 in compensation from the Company. This included $483,800 in salary, a $149,922 bonus, $2,185,530 in stock awards, $216,078 in non-equity incentive plan compensation, and $16,500 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Stephenson received $2,822,259 in compensation from the Company. This included $474,300 in salary, a $189,720 bonus, $2,142,039 in stock awards, and $16,200 in all other compensation.

52.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Stephenson made no

---

[4] Emphasis in original unless otherwise stated throughout.

purchases of Company stock and sold 23,000 shares of Company stock on June 28, 2017 for $34.58

per share, from which he benefited in the amount of approximately $795,248. His insider sale

made with knowledge of material non-public information before the material misstatements and

omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

53.     The Company's 2019 10-K stated the following about Defendant Stephenson:

*Robert O. Stephenson* (56) is our Chief Financial Officer and has served in this
capacity since August 2001. From 1996 to July 2001, Mr. Stephenson served as the
Senior Vice President and Treasurer of Integrated Health Services, Inc. Prior to
joining Integrated Health Services, Inc., Mr. Stephenson held various positions at
CSX Intermodal, Inc., Martin Marietta Corporation and Electronic Data Systems.

**Defendant Bernfield**

54.     Defendant Craig M. Bernfield ("Bernfield") served as a Company director from

April 2015 until he resigned effective October 23, 2018. He served as the Chairman of the

Investment Committee and as a member of the Nominating and Corporate Governance Committee.

55.     For the fiscal year ended December 31, 2018, Defendant Bernfield received

$72,340 in compensation from the Company, comprised entirely of $72,340 in fees paid or earned

in cash. For the fiscal year ended December 31, 2017, Defendant Bernfield received $250,249 in

compensation from the Company, comprised of $75,250 in fees paid or earned in cash, and

$174,999 in stock awards.

56.     The Company's Schedule 14A filed with the SEC on April 30, 2018 (the "2018

Proxy Statement") stated the following about Defendant Bernfield:

Mr. Bernfield brings to our Board extensive business, managerial and leadership
experience based primarily on his service as the Chairman of the board and Chief
Executive Officer of Aviv REIT Inc. ("Aviv"). Mr. Bernfield was appointed to our
Board effective April 1, 2015 pursuant to our merger agreement with Aviv.
Mr. Bernfield is former Chairman of the Board of Directors and Chief Executive
Officer of Aviv and served in such capacity since he co-founded Aviv Healthcare
Properties Limited Partnership in 2005 until our merger with Aviv on April 1, 2015.
From 1990 until co-founding Aviv in 2005, Mr. Bernfield was Chief Executive

Officer and President of Karell Capital Ventures, Inc., which managed the entities that were combined in 2005 in connection with the formation of Aviv's operating partnership. Mr. Bernfield has been an investor in the skilled nursing home industry for approximately 20 years.

**Defendant Bobins**

57.     Defendant Norman R. Bobins ("Bobins") has served as a Company director since April 2015 until he retired effective June 11, 2020. He served as a member of the Investment Committee. According to the 2020 Proxy Statement, as of April 13, 2020, Defendant Bobins beneficially owned 48,168 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $33.77, Defendant Bobins owned over $1.6 million worth of Omega stock.

58.     For the fiscal year ended December 31, 2019, Defendant Bobins received $204,491 in compensation from the Company, comprised of $4,500 in fees paid or earned in cash, and $199,991 in stock awards. For the fiscal year ended December 31, 2018, Defendant Bobins received $206,012 in compensation from the Company, comprised of $6,000 in fees paid or earned in cash, and $200,012 in stock awards. For the fiscal year ended December 31, 2017, Defendant Bobins received $252,748 in compensation from the Company, comprised of $27,750 in fees paid or earned in cash, and $224,998 in stock awards.

59.     The Company's Schedule 14A filed with the SEC on April 24, 2019 (the "2019 Proxy Statement") stated the following about Defendant Bobins:

> Mr. Bobins brings to the Omega Board extensive banking experience, financial and accounting knowledge and experience as a director of public companies. Mr. Bobins was appointed to the Omega Board effective April 1, 2015 pursuant to the merger agreement with Aviv. Mr. Bobins served as a director of Aviv from March 26, 2013 until the merger with Aviv on April 1, 2015. Prior to that, Mr. Bobins served as a member of the advisory board of Aviv Asset Management LLC from 2009 until March 26, 2013. In July 2008, Mr. Bobins was named Non-Executive Chairman of The PrivateBank and Trust Company, a bank subsidiary of PrivateBancorp, Inc. In 2017 Canadian Imperial Bank of Commerce ("CIBC") acquired The PrivateBank and Mr. Bobins was named Vice Chairman of CIBC's

US Region. From May 2007 until October 2007, Mr. Bobins was Chairman of the Board of LaSalle Bank Corporation. From 2003 to 2007, he was President and Chief Executive Officer of LaSalle Bank Corporation. From 2006 to 2007, he was President and Chief Executive Officer of ABN AMRO North America. Mr. Bobins also serves on the board of directors of AAR Corp (aviation services) and CIBC USA. In the past five years, Mr. Bobins also served on the boards of AGL Resources, Inc. (energy services) and Sims Metal Management Limited (metal and electronics recycling).

**Defendant Callen**

60.     Defendant Craig R. Callen ("Callen") has served as a Company director since April 2013 and has served as Chairman of the Board since June 8, 2017. He also serves as the Chair of the Investment Committee, as a member of the Audit Committee, and as a member of the Nominating and Governance Committee. According to the 2020 Proxy Statement, as of April 13, 2020, Defendant Callen beneficially owned 37,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $33.77, Defendant Callen owned over $1.2 million worth of Omega stock.

61.     For the fiscal year ended December 31, 2019, Defendant Callen received $360,229 in compensation from the Company, comprised of $150,250 in fees paid or earned in cash, and $209,979 in stock awards. For the fiscal year ended December 31, 2018, Defendant Callen received $365,750 in compensation from the Company, comprised of $155,750 in fees paid or earned in cash, and $210,000 in stock awards. For the fiscal year ended December 31, 2017, Defendant Callen received $320,253 in compensation from the Company, comprised of $102,750 in fees paid or earned in cash, and $217,503 in stock awards.

62.     The Company's 2020 Proxy Statement stated the following about Defendant Callen:

Mr. Callen brings to the Board financial and operating experience as an advisor, investment banker and board member in the healthcare industry. Mr. Callen was a Senior Advisor at Crestview Partners, a private equity firm, from 2009 through 2016. Mr. Callen retired as Senior Vice President of Strategic Planning and

Business Development for Aetna Inc., where he also served as a Member of the Executive Committee from 2004-2007. In his role at Aetna, Mr. Callen reported directly to the chairman and CEO and was responsible for oversight and development of Aetna's corporate strategy, including mergers and acquisitions. Prior to joining Aetna in 2004, Mr. Callen was a Managing Director and Head of U.S. Healthcare Investment Banking at Credit Suisse and co-head of Health Care Investment Banking at Donaldson Lufkin & Jenrette. During his 20-year career as an investment banker in the healthcare practice, Mr. Callen successfully completed over 100 transactions for clients and contributed as an advisor to the boards of directors and management teams of many of the leading healthcare companies in the U.S. Mr. Callen has served as a board member of HMS Holdings Corp. (NYSE:HMSY) since October 2013. Mr. Callen also serves as a director of Classical American Homes Preservation Trust. Previously he served on the boards of Symbion, Inc. (short-stay surgical facilities), a Crestview portfolio company, Sunrise Senior Living, Inc. (NYSE:SRZ) and Kinetic Concepts, Inc. (NYSE:KCI) (a medical technology company).

**Defendant Hill**

63.     Defendant Barbara B. Hill ("Hill") has served as a Company director since April 2013. She also serves as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of April 13, 2020, Defendant Hill beneficially owned 31,310 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $33.77, Defendant Hill owned approximately $1.1 million worth of Omega stock.

64.     For the fiscal year ended December 31, 2019, Defendant Hill received $207,477 in compensation from the Company, comprised of $7,500 in fees paid or earned in cash, and $199,977 in stock awards. For the fiscal year ended December 31, 2018, Defendant Hill received $228,012 in compensation from the Company, comprised of $28,000 in fees paid or earned in cash, and $200,012 in stock awards. For the fiscal year ended December 31, 2017, Defendant Hill received $257,248 in compensation from the Company, comprised of $32,250 in fees paid or earned in cash, and $224,998 in stock awards.

65.     The Company's 2020 Proxy Statement stated the following about Defendant Hill:

Ms. Hill brings to the Board years of experience in operating healthcare-related companies. Ms. Hill is currently an Operating Partner of NexPhase Capital (formerly Moelis Capital Partners), a private equity firm, where she focuses on healthcare-related investments and providing strategic and operating support for NexPhase's healthcare portfolio companies. She began as an Operating Partner of Moelis Capital Partners in March 2011. From March 2006 to September 2010, Ms. Hill served as Chief Executive Officer and a director of ValueOptions, Inc., a managed behavioral health company, and FHC Health Systems, Inc., its parent company. Prior to that, Ms. Hill served as President and a director of Express Scripts, Inc., a pharmacy benefits management company. In previous positions, Ms. Hill was responsible for operations nationally for Cigna HealthCare, and also served as the CEO of health plans owned by Prudential, Aetna, and the Johns Hopkins Health System. She was active with the boards or committees of the Association of Health.

**Defendant Kloosterman**

66.    Defendant Harold J. Kloosterman ("Kloosterman") served as a Company director from 1992 until he retired on June 8, 2017, at which point he was a member of the Audit Committee.

67.    For the fiscal year ended December 31, 2017, Defendant Kloosterman received $60,751 in compensation from the Company, comprised of $35,750 in fees paid or earned in cash, and $25,001 in stock awards.

68.    The Company's Schedule 14A filed with the SEC on April 25, 2016 stated the following about Defendant Kloosterman:

Mr. Kloosterman brings to our Board years of experience in the development and management of real estate. Mr. Kloosterman has served as President of Cambridge Partners, Inc., a company he formed in 1985, from 1985 thru 2014. He has been involved in the development and management of commercial, apartment and condominium projects in Grand Rapids and Ann Arbor, Michigan and in the Chicago area. Mr. Kloosterman was formerly a Managing Director of Omega Capital from 1986 to 1992. Mr. Kloosterman has been involved in the acquisition, development and management of commercial and multifamily properties since 1978. He has also been a senior officer of LaSalle Partners, Inc. (now Jones Lang LaSalle).

**Defendant Korman**

69.     Defendant Bernard J. Korman ("Korman") has served as a Company director from 1993, and as Chairman of the Board from March 8, 2004 until he retired from the Board effective June 8, 2017. He also served as a member of the Compensation Committee, as a member of the Investment Committee, and as a member of the Nominating and Corporate Governance Committee. Defendant Korman also served as a Director Emeritus from June 8, 2018 until June 7, 2019.

70.     For the fiscal year ended December 31, 2017, Defendant Korman received $288,998 in compensation from the Company, comprised of $64,000 in fees paid or earned in cash, and $224,998 in stock awards.

71.     The Company's Schedule 14A filed with the SEC on April 25, 2017 (the "2017 Proxy Statement") stated the following about Defendant Korman:

> Mr. Korman brings to our Board extensive experience in healthcare, experience as a director of a real estate investment trust ("**REIT**"), and experience as a chairman from his former role as Chairman of Pep Boys. Mr. Korman has served as Chairman of the Board since March 8, 2004. Mr. Korman served as Chairman of the Board of Trustees of Philadelphia Health Care Trust, a private healthcare foundation, from December 1995 to June 30, 2010. Mr. Korman is also a director of The New America High Income Fund, Inc. (NYSE:HYB) (financial services) and a past director of Medical Nutrition USA, Inc., a nutritional products company and NutraMax Products, Inc., a consumer health care products company. He was formerly President, Chief Executive Officer and director of MEDIQ Incorporated, a publicly held health care service provider from 1977 to 1995. Mr. Korman served as a Trustee of Kramont Realty Trust (NYSE:KRT), a publicly held REIT, from June 2000 until its merger in April 2005. Mr. Korman also served as a director of The Pep Boys, Inc. (NYSE:PBY) from 1983, and as Chairman of the board of directors from May 2003 until his retirement from such board in September 2004.

**Defendant Lowenthal**

72.     Defendant Edward Lowenthal ("Lowenthal") has served as a Company director since 1995. He serves as the Chairman of the Compensation Committee and as a member of the

Nominating and Governance Committee. Previously, he served as a member of the Audit Committee. According to the 2020 Proxy Statement, as of April 13, 2020, Defendant Lowenthal beneficially owned 56,934 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $33.77, Defendant Lowenthal owned over $1.9 million worth of Omega stock.

73.     For the fiscal year ended December 31, 2019, Defendant Lowenthal received $236,001 in compensation from the Company, comprised of $86,000 in fees paid or earned in cash, and $150,001 in stock awards. For the fiscal year ended December 31, 2018, Defendant Lowenthal received $264,009 in compensation from the Company, comprised of $114,000 in fees paid or earned in cash, and $150,009 in stock awards. For the fiscal year ended December 31, 2017, Defendant Lowenthal received $275,749 in compensation from the Company, comprised of $100,750 in fees paid or earned in cash, and $174,999 in stock awards.

74.     The Company's 2020 Proxy Statement stated the following about Defendant Lowenthal:

> Mr. Lowenthal brings to our Board extensive experience in the development and operation of real estate. Mr. Lowenthal currently serves as Chairman of the Board of Directors of American Campus Communities (NYSE: ACC) (a public developer, owner and operator of student housing at the university level) and serves as a trustee of the Manhattan School of Music. Mr. Lowenthal also served as non-executive Chairman of REIS, Inc., a public provider of real estate market information and valuation technology (NASDAQ:REIS) from November 2010 until his term expired in 2012. From January 1997 to March 2002, Mr. Lowenthal served as President and Chief Executive Officer of Wellsford Real Properties, Inc. (a real estate merchant bank) and was President of the predecessor of Wellsford Real Properties, Inc. since 1986. He is co-founder of Wellsford Strategic Partners, a private real estate investment company and is non-executive Chairman of Tiburon Lockers, Inc., a private rental locker company.

**Defendant Perks**

75.     Defendant Ben W. Perks ("Perks") served as a Company director from April 2015 until he retired effective June 7, 2019. He also served as the Chairman of the Audit Committee. According to the 2020 Proxy Statement, as of April 13, 2020, Defendant Perks beneficially owned 48,940 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $33.77, Defendant Perks owned over $1.6 million worth of Omega stock.

76.     For the fiscal year ended December 31, 2019, Defendant Perks received $25,000 in compensation from the Company, comprised entirely of fees paid or earned in cash. For the fiscal year ended December 31, 2018, Defendant Perks received $229,009 in compensation from the Company, comprised of $79,000 in fees paid or earned in cash, and $150,009 in stock awards. For the fiscal year ended December 31, 2017, Defendant Perks received $263,999 in compensation from the Company, comprised of $89,000 in fees paid or earned in cash, and $174,999 in stock awards.

77.     The Company's 2018 Proxy Statement stated the following about Defendant Perks:

Mr. Perks brings to our Board extensive public accounting, public company, accounting and financial reporting experience. Mr. Perks was appointed to our Board effective April 1, 2015 pursuant to our merger agreement with Aviv. Mr. Perks served as a director of Aviv since 2007 until our merger with Aviv on April 1, 2015. Mr. Perks was the Executive Vice President and Chief Financial Officer of Navigant Consulting, Inc., a NYSE-listed company, from May 2000 until his retirement in August 2007. Prior to joining Navigant, Mr. Perks was with PricewaterhouseCoopers LLP and its predecessors for 32 years, including 22 years as a partner in the Audit and Financial Advisory Services groups.

**Defendant Plavin**

78.     Defendant Stephen D. Plavin ("Plavin") has served as a Company director since 2000. He also serves as the Chairman of the Nominating and Governance Committee and as a

member of the Compensation Committee. Previously, he served as a member of the Audit Committee. According to the 2020 Proxy Statement, as of April 13, 2020, Defendant Plavin beneficially owned 90,156 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $33.77, Defendant Plavin owned over $3.0 million worth of Omega stock.

79.    For the fiscal year ended December 31, 2019, Defendant Plavin received $227,003 in compensation from the Company, comprised of $77,000 in fees paid or earned in cash, and $150,003 in stock awards. For the fiscal year ended December 31, 2018, Defendant Plavin received $231,509 in compensation from the Company, comprised of $81,500 in fees paid or earned in cash, and $150,009 in stock awards. For the fiscal year ended December 31, 2017, Defendant Plavin received $271,749 in compensation from the Company, comprised of $96,750 in fees paid or earned in cash, and $174,999 in stock awards.

80.    The Company's 2020 Proxy Statement stated the following about Defendant Plavin:

> Mr. Plavin brings to the Board management experience in the banking and mortgage-based real estate investment trust sector, as well as significant experience in real estate capital markets transactions. Mr. Plavin is a Senior Managing Director of the Blackstone Group (since December 2012) and the Chief Executive Officer and a Director of Blackstone Mortgage Trust, Inc., a New York City-based mortgage REIT that is managed by Blackstone. Prior to joining Blackstone, Mr. Plavin served as CEO of Capital Trust, Inc. (predecessor of Blackstone Mortgage Trust), since 2009. From 1998 until 2009, Mr. Plavin was Chief Operating Officer of Capital Trust and was responsible for all of the lending, investing and portfolio management activities of Capital Trust, Inc. Prior to that time, Mr. Plavin was employed for 14 years with Chase Manhattan Bank and its securities affiliate, Chase Securities Inc. Mr. Plavin held various positions within the real estate finance unit of Chase, and its predecessor, Chemical Bank, and in 1997 he became co-head of global real estate for Chase. Mr. Plavin was the Chairman of the Board of Directors of WCI Communities, Inc. (NYSE:WCIC), a publicly- held developer of residential communities from August 2009 until it was purchased by Lennar Corporation (NYSE:LEN and LEN.B) in February 2017.

**Defendant Anand**

81.      Defendant Kapila K. Anand ("Anand") has served as a Company director since 2018. She also serves as the Chairman of the Audit Committee. According to the 2020 Proxy Statement, as of April 13, 2020, Defendant Anand beneficially owned 9,079 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $33.77, Defendant Anand owned nearly $306,598 worth of Omega stock.

82.      For the fiscal year ended December 31, 2019, Defendant Anand received $227,503 in compensation from the Company, comprised of $77,500 in fees paid or earned in cash, and $150,003 in stock awards.

83.      The Company's 2020 Proxy Statement stated the following about Defendant Anand:

> Ms. Anand brings to the board extensive experience in accounting and auditing, particularly in the real estate industry, with a focus on Real Estate Investment Trusts, and healthcare industries. Ms. Anand served as an audit and later advisory partner at KPMG LLP from 1989 until her retirement in March 2016. Ms. Anand joined KPMG LLP in 1979 and served in a variety of roles including the National Partner-in-Charge, Public Policy Business Initiatives (from 2008 to 2013) and segment leader for the Travel, Leisure, and Hospitality industry and member of the Global Real Estate Steering Committee (each from 2013 to 2016). Ms. Anand has served on KPMG LLP boards in the U.S. and Americas, the board of the Franciscan Ministries (an organization with a range of real estate assets, including schools, churches and hospitals) and as the chair of both the KPMG Foundation as well as the Chicago Network (a membership organization of senior executives). She is currently the Lead Director for the Women Corporate Directors Education and Development Foundation and serves on a variety of non-profit boards including Rush University Medical Center and the US Fund for UNICEF. Ms. Anand has served as a director of Extended Stay America, Inc. (NASDAQ:STAY) since July 2016, where she chairs the Compensation Committee and has also served as a director and Audit Committee Chairwoman of ESH Hospitality, Inc. (a REIT subsidiary of Extended Stay America) since May 2017. In September 2018, she joined the Board of Elanco Animal Health, Inc. (NYSE:ELAN), where she chairs the Audit Committee.

**Defendant Whitman**

84.     Defendant Burke W. Whitman ("Whitman") has served as a Company director since 2018. He also serves as the member of the Audit Committee. According to the 2020 Proxy Statement, as of April 13, 2020, Defendant Whitman beneficially owned 8,188 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 13, 2020 was $33.77, Defendant Whitman owned nearly $279,509 worth of Omega stock.

85.     For the fiscal year ended December 31, 2019, Defendant Whitman received $192,961 in compensation from the Company, comprised of $55,000 in fees paid or earned in cash, and $137,961 in stock awards.

86.     The Company's 2020 Proxy Statement stated the following about Defendant Whitman:

> Mr. Whitman brings to the Board extensive leadership experience in military and corporate board and executive roles, as well as corporate financial and management experience in the healthcare sector. Since January 2019, he has served as CEO of Colmar Holdings, LLC (a private firm providing capital to enterprises committed to the common good). In addition, since June 2019, he has served as a member of the Board of Directors of Amicus Therapeutics (Nasdaq: FOLD) (Audit & Compliance Committee; Nominating & Governance Committee), and since January 2019, as a civilian member of the Reserve Forces Policy Board (Advisor to the Secretary of Defense). Previously, Mr. Whitman served concurrently in national military service and business roles. From 1985 to 2019, he served as a reserve officer of the U.S. Marine Corps, including full-time active duty from 1985 to 1988 and from 2009 to 2018, during which he led multiple combat deployments, served as the Commanding General of the 4th Marine Division and of Marine Forces Reserve, and retired as a Major General and the Corps' senior reservist. From 1988 to 2008, concurrent with his military roles, he also served as CEO and initially COO of Health Management Associates, Inc. (then NYSE:HMA) from 2005 to 2008, founding CFO of Triad Hospitals, Inc. (then NYSE:TRI) from 1998 to 2005, President of Deerfield Healthcare (then a private company) from 1994 to 1998, Vice President of Finance of Almost Family (then Nasdaq:AFAM) from 1992 to 1994, and Investment Banker with Morgan Stanley (NYSE:MS) from 1988

31

to 1992. In his civic roles, he has also served previously on the Board of Directors of the Toys for Tots Foundation (Chair of the Investment Committee) and the Board of Directors of the Federation of American Hospitals (Chair of the Audit Committee), and currently serves as a member of the Board of Trustees of The Lovett School in Atlanta, Georgia.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

87.     By reason of their positions as officers, directors, and/or fiduciaries of Omega and because of their ability to control the business and corporate affairs of Omega, the Individual Defendants owed Omega and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Omega in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Omega and its shareholders so as to benefit all shareholders equally.

88.     Each director, officer, and controller of the Company owes to Omega and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

89.     The Individual Defendants, because of their positions of control and authority as directors, officers, and/or controllers of Omega, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

90.     To discharge their duties, the officers, directors, and controllers of Omega were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

91.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the

affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers, and controllers of Omega, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers, directors, and/or controllers of the Company has been ratified by the remaining Individual Defendants who collectively comprised Omega's Board at all relevant times.

92.     As senior executive officers, directors, and controllers of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

93.     To discharge their duties, the officers and directors of Omega were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Omega were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent

manner in accordance with the laws and regulations of Maryland, and the United States, and pursuant to Omega's own Code of Business Conduct and Ethics;

   (b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

   (c) remain informed as to how Omega conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

   (d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Omega and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

   (e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Omega's operations would comply with all applicable laws and Omega's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

   (f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

   (g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

94.     Each of the Individual Defendants further owed to Omega and the shareholders the duty of loyalty requiring that each favor Omega's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

95.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Omega and were at all times acting within the course and scope of such agency.

96.     Because of their advisory, executive, managerial, directorial, and controlling positions with Omega, each of the Individual Defendants had access to adverse, non-public information about the Company.

97.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Omega.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

98.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

99.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (1) facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, violations of Sections 14(a) of the Exchange Act, and for contribution under Sections 10(b) and 21D of the Exchange Act; (2) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (3) artificially inflate the Company's stock price.

100.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Omega was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

101.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

102.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Omega, and was at all times acting within the course and scope of such agency.

## OMEGA'S CODE OF CONDUCT

103.    The Company's Code of Business Conduct and Ethics (the "Code of Conduct"), provides "directors, officers and employees [of the Company] guidance in recognizing and properly resolving any ethical and legal issues they may encounter while conducting the Company's business." The Code of Conduct also states that "[a]s a condition to serving as a director, officer or employee of the Company, each of us is expected to fully comply with [such individual] is expected to fully comply with th[e] [Code of Conduct]." Moreover, the Code of Conduct states that "[i]t is important that all directors, officers and employees of Omega protect the interests of [the Company's] employees, shareholders and customers by conducting [the Company's] business in an ethical and proper manner."

104.    In a section titled "Fair Dealing; Compliance with Laws," the Code of Conduct states:

> Each director, officer and employee is expected to (1) act honestly, ethically, fairly and in good faith with all the Company's customers, suppliers, competitors and employees and (2) obey all laws. No director, officer or employee should take advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice. No director, officer or employee should enter into any transaction or take any action (or fail to take any action) on the Company's behalf which he or she knows or would reasonably be expected to know would violate any law. Nor should you assist any third party in violating any law, whether or not your assistance is itself a violation.

105.    In a section titled "Conflicts of Interest," the Code of Conduct states:

> All directors, officers and employees must discharge their responsibilities on the basis of what is in the best interest of the Company, independent of personal considerations or relationships. They must avoid any investments, business interests or other associations that interfere or appear to interfere with or influence their objective judgment in furtherance of their responsibility to act in the Company's best interests. You should never use your position or the knowledge gained from your relationship with Omega for your own personal advantage (or the advantage of any third party), nor should you permit yourself to hat might create a

conflict between your personal interests (and the interests of any third party) and your obligations to Omega.

106.    The Code of Conduct provides, as to "Public Disclosure," that:

In connection with the Company's financial statements, public reports and other public disclosures, no director, officer or employee, acting in his or her capacity as such, shall defraud any person or make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. All of us (especially our CEO, CFO, Chief Legal Officers, Chief Accounting Officer, Controller, and Director of Financial Reporting) must ensure that all Omega filings with or submissions to the Securities and Exchange Commission, as well as any other public communications, contain full, fair, accurate, timely and understandable disclosures.

To help meet this requirement and our related financial, legal and management obligations, we must maintain sound and reliable internal controls, always prepare our business records accurately and reliably and ensure that our financial records are always kept in accordance with those controls, records and generally accepted accounting principles (GAAP), consistently applied. We also must ensure that compliance with GAAP is sufficient to fulfill the Company's disclosure obligations for financial transactions and, if not, provide sufficient understandable additional disclosure. Each director, officer and employee must cooperate fully with the Company's accounting and internal audit staff, as well as the Company's independent public accountants and counsel.

No Company fund or asset may be maintained that is not properly recorded in the Company's records, nor any false or misleading entry be made on the Company's books. All reports, vouchers, bills, payroll and service records, measurement and performance records, expense accounts and other important data must be prepared with care and honesty and fully and accurately reflect all transactions. There is no excuse for a deliberately false or misleading report or record, such as improper revenue recognition, a "dummy" charge, an expense report or record that "covers up" a bribe or other improper payment, etc.

107.    The Code of Conduct provides, as to "Insider Information and Securities Law

Compliance," that:

Directors, officers and employees of the Company who have access to confidential information of the Company are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of the Company's business. All non-public information about the Company is considered confidential information. To use non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of

this information (even if you do not receive any personal financial benefit) is not only unethical but also illegal. Officers and employees must review and comply with the Company's Insider Trading Policy.

108.    The Code of Conduct also provides that Omega "has other important policies for its employees concerning … equal employment opportunity and related matters that are set forth from time to time in the Omega Employee Manual and are incorporated herein by this reference."

109.    The Code of Conduct provides that each individual covered thereby "is responsible for bringing to the attention of the Company any circumstances that we believe may constitute a violation of this Business Code. The failure to discharge this responsibility may be as serious as the violation itself." "We especially encourage you to use the procedures set forth in the Whistleblower Policy if you have a concern about the Company's accounting, internal accounting controls or auditing, financial reporting or legal compliance matters."

**Omega's Nominating and Corporate Governance Committee Charter**

110.    The Nominating and Corporate Governance Committee Charter provides that the purpose of the Nominating and Corporate Governance Committee is to: "(1) identify individuals qualified to become members of the Board consistent with criteria approved by the Board, (2) select, or recommend that the Board select, the director nominees for the next annual stockholders meeting, (3) develop and recommend to the Board a set of corporate governance principles applicable to the Company, and (4) oversee the evaluation of the Board and management."

111.    The Nominating and Corporate Governance Committee Charter further provides that the committee's responsibilities include "[i]dentifying individuals believed to be qualified to become members of the Board consistent with criteria approved by the Board," "selecting, or recommending to the Board, the nominees to stand for election as directors at the annual meeting of stockholders or at a special meeting of stockholders, as applicable. In selecting or recommending candidates, the Committee shall take into account the criteria approved by the

Board and such other factors as it deems appropriate," "overseeing the evaluation of the Board and management," "[d]eveloping and recommending to the Board corporate governance principles of the Company and reviewing such principles periodically."

112.    The Nominating and Corporate Governance Committee Charter also provides that the "Committee will perform such other functions as required by law."

### Corporate Governance Guidelines

113.    The Company's Corporate Governance Guidelines states that the "Nominating and Corporate Governance Committee is responsible for reviewing on an annual basis, the requisite skills and characteristics of new Board members as well as the composition of the Board as a whole."

114.    The Corporate Governance Guidelines further provides that the "Board does not believe it should establish term limits" even though it continues to concede that "term limits could help insure that there are fresh ideas and viewpoints available to the Board."

### Human Capital Support & Development

115.    The Company's Human Capital Support & Development policy provides that the Company's "employees' commitment to Omega … creates an inclusive and collegial working environment…"

### Human Rights Policy

116.    The Company's Human Rights Policy provides the following, in relevant part:

*Discrimination*: *As an equal opportunity employer, Omega values the diversity of the unique individuals who make up our team and do not discriminate on the basis of an individual's race*, gender, age, color, religion, national origin, disability, sexual orientation, ancestry, genetic information, military service, creed, pregnancy, marital status, citizenship, gender identity, gender expression or any other status protected by applicable law.

(Emphasis added.)

40

117.    In violation of the Code of Conduct, certain of the Individual Defendants conducted little, if any, oversight of the Company's engagement in certain of the Individual Defendants' scheme to issue materially false and misleading statements to the public relating to, *inter alia*, Orianna's financial condition and the Working Capital Loan and to facilitate and disguise certain of the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and for contribution under Sections 10(b) and 21D of the Exchange Act. Two of the Individual Defendants violated the code by selling shares while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

118.    In violation of the Code of Conduct, the Nominating and Corporate Governance Committee Charter, the Human Capital Support & Development policy, and the Human Rights Policy, the Individual Defendants engaged in or permitted the Discriminatory Misconduct and conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public regarding, *inter alia*, the Discriminatory Misconduct and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Background**

119.    Omega is a real estate investment trust which invests in skilled nursing and senior care facilities in the United States and the United Kingdom. The Company purportedly provides lease or mortgage financing to operators of healthcare facilities, which provide care for patients and maintain such facilities. Omega's operators are tenants, mortgagors and affiliates of the Company who manage and or operate Omega's properties. Typically, Omega enters into triple-net lease agreements pursuant to which the operators are responsible for all expenses related to the leases facilities in addition to rental payments to Omega. However, Omega also engages in direct financing lease transactions. As of December 31, 2016, Omega's real estate investment property portfolio included properties managed by 79 various operators. Two of the Company's top operators are (1) Orianna; and (2) Signature Holdings II, LLC ("Signature").

120.    In 2013, Behrman Capital ("Behrman") retained Jefferies LLC ("Jefferies") to market and sell its ownership stake in Ark Holding Company, Inc. ("Ark") and Jefferies then identified Red Oak Acquisitions ("Red Oak") as a potential purchaser. On September 13, 2013, Omega agreed to finance a $525 million leverage buyout of the skilled nursing facility which was owned by Red Oak.[5] The deal was structured so that, pursuant to a merger agreement, Behrman transferred all of the stock of Ark through the Schwartzbergs wholly owned subsidiary, 4 West holdings, Inc. ("4 West") which borrowed $525 million from Omega to, among other things, pay $239 million to Behrman in exchange for the stock and to repay Ark's then-outstanding debt. At the same time, Omega financed the Schwartzbergs' acquisition by way of a sale leaseback

---

[5] Red Oak's owner, the Schwartzberg Family Trusts (the "Schwartzbergs") had a working relationship with Omega as the Company had previously financed another deal for a skilled nursing facility, called the Gulf Coast, owned by the Schwartzbergs.

transaction and secured the debt with Ark's assets. i.e. the skilled nursing facilities. Despite the fact that the Schwartzbergs' Gulf Coast skilled nursing facilities had been struggling financially, Omega went along with the deal, in part, because it exposed Omega to four new markets and would pave the way as a paradigm for similarly large portfolio acquisitions in the future. Although Orianna would not have any equity in the facilities at the time of the deal, Omega did not obtain an independent solvency opinion.

121.   The result of the transaction was that the Schwartzbergs took ownership of 100% of Orianna's stock without having put in any of their own capital and subsequently charged Orianna millions of dollars in fees for various services that Schwartzbergs-owned entities such as Health Care Navigator LLC ("HCN") (in-house legal and back-office administrative services), Halcyon Rehabilitation, LLC (therapy services), and HMS Purchasing LLC (group purchaser of medical supplies, food, other equipment and supplies), provided to Orianna.

122.   As a consequence of the leveraged buyout, Orianna's long-term debt ballooned from $267 million to $529 million as shareholder equity plummeted from $193 million to $0. As of December 31, 2013, Omega's investment in Ark, at 14%, was the only operator that represented more than 10% of Omega's total investments. Additionally, as of December 31, 2016, Omega's investment in Orianna facilities was $619,281,496, which represented nearly 7% of the Company's overall investment portfolio, making it Omega's second largest operator with respect to total investment.

123.   Omega does not operate the skilled nursing facilities in which it invests. Instead, the Company owns the property or provides financing to those facilities and seeks to deliver returns by collecting payments for the rent or mortgage from its operators. Therefore, Omega depends on the operators of its skilled nursing facilities to operate in compliance with legal and regulatory

requirements and also produce sufficient revenue to make those payments. As a result, Omega's standard lease agreement with its skilled nursing facility operators, including Orianna which had entered into lease agreements with Omega to rent facilities in various parts of the country, included provisions which ensured the protection of its investments by permitting Omega to keep informed regarding the financial circumstances of its operators. In turn, Omega sought to obtain: "(i) contractual rent escalations under long-term, non-cancelable, 'triple-net' leases and (ii) fixed-rate mortgage loans" and typically obtained "substantial liquidity deposits, covenants regarding minimum working capital and net worth, liens on accounts receivable and other operating assets, and various provisions for cross-default, cross-collateralization and corporate and or personal guarantees…."

124.   On May 4, 2017, John Roberts, an analyst at Hilliard Lyons, published a report which praised Omega for having "retained its FFO guidance for 2017 at $3.40-$3.44 a share" and noted that "[i]nvestors always worry about a REIT's ability to find a new tenant when one leaves, and we believe that OHI management is very capable of doing just that, replacing a problem tenant with a new one, if any investigation were to result in such an issue." However, Roberts did describe the risk of certain investigations of the justice department into its operators as a "fundamental risk" to Omega.

### Orianna's Liquidity Issues

125.   During a hearing held in 2018 by the bankruptcy court,[6] Orianna's Chief Restructuring Officer ("CRO"), Louis E. Robichaux, IV ("Robichaux")[7] stated that Orianna was

---

[6] 4 West Holdings, Inc., along with 134 other entities (collectively doing business as Orianna Health Systems), filed petitions under Chapter 11 bankruptcy on March 6, 2018 in the United States Bankruptcy Court for the Northern District of Texas, Case No. 18-30777 ("Orianna Bankruptcy").

[7] Robichaux is a principal at Ankura, which is located in Dallas, Texas, and, according to its

"overleveraged from the inception, from the time the [Schwartzbergs] purchased the company." Additionally, HCN's Chief Development and Legal Officer, Trey Blalock, later stated that Orianna was "overleveraged from the inception."

126.   At a deposition taken on April 12, 2018 by the Unsecured Creditors Committee, Robichaux acknowledged that "the structure of the rent payments in the Omega lease escalates and increases over time. So over time… even if the company's performance is flat, their rent payments become a larger and larger burden." Robichaux opined that at the start, Orianna had "sufficient cash flow to pay rent and pay its operating obligations" but that in mid-2015 Orianna began to struggle to meet its rental payment obligations.

127.   On May 8, 2017, Orianna hired Ankura "in an advisory capacity as well as to review strategic alternatives relating to [Orianna's] existing debt obligations."[8] Robichaux testified that when he first began working as a consultant to Orianna he was hired to "look[] at some operational reporting and potential ways to improve performance of [Orianna]," and he found that Orianna's "liquidity constrained" and that it was "operationally struggling."

128.   After the leveraged buyout in 2013, Orianna's unsecured trade debt increased from $34 million to $64 million and shareholder equity plunged from negative $3 million to negative $164 million in 2017. Pursuant to the Unsecured Creditors Committee review of the information

---

website, provides services to clients "facing an immediate challenge to its business trying to opportunistically increase the value of their company, or protect against future risks, Ankura designs, develops, and executes tailored solutions by assembling the right combination of expertise." According to his bio, Robichaux provides restructuring crisis management, financial advisory, and expert witness services to parties in a broad variety of distressed corporate settings, with a significant emphasis on the US healthcare industry," and has "30 years of industry and restructuring experience, with significant expertise serving in chief restructuring officer roles."
[8] Robichaux's March 7, 2018 Declaration In Support of Chapter 11 Petitions and First Day Pleadings.

and testimony in Orianna's Bankruptcy, the leveraged buyout left Orianna with no capital and rendered it insolvent.

129.   Pursuant to four long term master leases, which consisted of the South East Master Lease, the Indiana Master Lease, the North West Master Lease, and the Texas Master Lease,[9] the Orianna Entities paid "rent" to the Omega Entities to repay the $525 million Omega lent to the Orianna Entities as nominal tenants. Additionally, the master leases showed rent payments on a schedule titled "Amortization of Funded Amount," which also consisted of the Company's gross investment, carrying amount of the leased property, unearned profit, and the total amount of principal paid per month.

130.   After the leveraged buyout in 2013, the Company's annual report which it filed on Form 10-K for the fiscal year ended December 31, 2013 with the SEC on February 11, 2014, stated:

> On November 27, 2013, we closed on a purchase/leaseback transaction with Ark Holding Company, Inc. ("Ark Holding") pursuant to which Omega acquired 55 SNFs and 1 ALF. We leased the facilities back to the prior operator pursuant to four 50-year lease **yielding 10.6% per annum over the term of the lease**. The purchase/leaseback transaction is being accounted for as a direct financing lease. The lease agreement allows the tenant the right to purchase the facilities for a bargain purchase price plus closing costs at the end of the lease. In addition, commencing in the 41st year of the lease, the tenant will have the right to prepay the remainder of its obligations thereunder for an amount equal to the sum of the unamortized portion of the investment plus the net present value of the remaining

---

[9] The South East Master Lease consisted of 40 Omega operating subsidiaries serving as nominal landlords to Orianna's property companies. The Indiana Master Lease consisted of one Omega operating subsidiary serving as a nominal landlord to Orianna property companies. The North West Master Lease consisted of seven Omega operating subsidiaries serving as nominal landlords to Orianna property companies. The Texas Master Lease consisted of nine Omega operating companies serving as nominal landlords to Orianna property companies. Collectively, Omega's wholly-owned operating companies that the Company formed to serve as nominal landlords for the skilled nursing facilities are referred to herein as the "Omega Entities." The holding companies formed by Orianna that owned the property companies and served as nominal tenants of the skilled nursing facilities and were obligated to pay rent to Omega are referred to herein as the "Orianna Entities."

payments under the lease, and closing costs. In the event the tenant exercises either of these options, we have the right to purchase the properties for fair market value at the time.

The 56 facilities represent 5,624 licensed beds located in 12 states, predominantly in the southeastern United States. The 56 facilities are separated by region and divided amongst four cross-defaulted master leases. The four regions include the Southeast (39 facilities), the Northwest (7 facilities), Texas (9 facilities) and Indiana (1 facility). Contractual rent for years 1-4 is approximately $47 million with 2.5% annual escalators beginning in year five through the term of the lease.

(Emphasis added.)

131.    However, at the outset of the leaseback transactions, the monthly rent that the Orianna Entities paid to Omega was insufficient to cover the amount Orianna owed to Omega. For instance, under the South East Master Lease, Orianna had an outstanding balance of $472,823,963 as of December 31, 2013 and according to §1.4 of the South East Master Lease, "Base Rent" was $42 million per year for the first four years. But, at an interest rate of 10.58%, as listed on the outstanding balance, the initial annual base rent on the skilled nursing facilities under the South East Master Lease should have been slightly more than $50 million, or $4.17 million per month. Consequently, rather than paying down Orianna's outstanding debt in the initial years of the South East Master Lease, Omega accumulated additional debt in the amount of over $8 million.

132.    Under the terms of the master leases, starting on January 1, 2017, base rent on Orianna's North West, Indiana, and Texas skilled nursing facilities rose by 2.5% per year and base rent on the South East Master Lease began to increase on January 1, 2018. During the Company's earnings call on February 9, 2017 ("February 2017 Earnings Call"), Defendant Booth stated that "we've always looked at the escalator between 2% to 2.5%. And our current average is slightly above 2%." Accordingly, the increases in rent for the Orianna Entities pursuant to the four Orianna master leases was approximately 25% more than the Company's average rent increase, which only added to Orianna's financial instability.

133.    According to deposition testimony given by Robichaux on April 12, 2018, "[Julie

Gutzmann, "senior financial person, historically" of Orianna's operations company, HCN,][10] said

there were not cash flow problems initially." Instead, Robichaux stated:

> Cash flow problems arose as a result of . . . [t]hree things: Unexpected headwinds
> in the industry, which is generally well known and folks have written about; second,
> operating managerial issues specific to Orianna such as this northwest lease, such
> as other problems of noncompliance and so on; and third, the escalating lease
> payments that were in existence at the time of the merger.

134.    According to the Unsecured Creditors Committee's complaint in the Orianna

Bankruptcy, Orianna "limp[ed] along," with increasing negative shareholder equity during the first

two years of the term of the lease. Further, "Omega became very concerned with [Orianna's] rent

coverage ratio" by, at the latest, December 2015. Although Orianna managed to pay rent for the

first two years of lease, its unsecured debt and monies it owed beyond rent began to grow, making

it increasingly financially unstable until Orianna's debt reached $100 million in March 2018 when

Orianna finally commenced the Orianna Bankruptcy case seeking protection from its creditors.

Approximately one year after the leveraged buyout, Orianna, with Omega's assistance, decided to

"divest" certain skilled nursing facilities which it had operated at a deficit. Accordingly, Orianna

and Omega began to shop for sale the skilled nursing facilities that the Texas Master Lease covered

in late 2014.

135.    Then, during the second half of 2016, Orianna and Omega started to market the

skilled nursing facilities that the North West Master Lease covered and, in the beginning of 2017,

sold those skilled nursing facilities to different operators.

---

[10] Julie Gutzmann was chief financial officer of Asset Navigator, LLC, an entity the Schwartzbergs
owned, and CFO of HCN. Asset Navigator did not provide goods or services directly to Orianna.
Instead, pursuant to a consulting and advisory services agreement, it provided senior-level
management consulting services to HCN through its contractors and/or employees in exchange for
a monthly fee.

136.    However, by 2017, Orianna's financial condition deteriorated as the rent on three of the master leases increased. Notwithstanding, Defendant Pickett stated in Omega's February 8, 2017 press release, announcing Omega's fourth quarter 2016 financial results, that notwithstanding industry challenges, Omega was well positioned to deliver superior results. In the earnings call, the next day, Pickett also stated:

> As I indicated in our press release **we believe 2017 will be particularly challenging for the skilled nursing facility industry**. The combination of labor cost pressures and [census] pressure will continue to challenge operators' net cash flow. In addition, an increasingly aggressive regulatory and Department of Justice environment continues to divert many management teams' attention away from patient care to deal with survey and legal issues not to mention the cost of defending and settling these issues. We will continue to work proactively with our operators to identify ways to maintain operating cash flow and manage through these issues.

(Emphasis added.)

137.    Defendant Booth echoed Defendant Pickett's comments, stating:

> Our operator coverage has steadily declined throughout 2016 due to a number of factors including: increased labor costs, a dip in the overall quality mix as a percentage of revenue, which has been driven by continued pressure on the length of stay, and Omega's annual rent escalators which average over 2%. As Taylor mentioned we continue to work with our operators to provide support for the challenges currently facing our industry. Accordingly, during 2016 Omega repositioned a number of assets within our portfolio including a sale of 38 facilities and the re-leasing of eight additional facilities we expect to continue these reposition efforts throughout 2017.

138.    Vikas Gupta ("Gupta") has served as Omega's Senior Vice President of Acquisitions and Development since April 2015 and joined Omega in 2011. According to the Company's website, "Mr. Gupta is involved in acquisitions, construction, and capital expenditure activity, overseeing a team of investment professionals, while being one of the primary contacts for operator relationships at Omega." In that capacity, Gupta testified,[11] "I lead new deal activity

---

[11] In the Orianna Bankruptcy, Gupta testified under oath on April 12, 2018 and again on September 12, 2018. At the time, the parties designated the transcripts confidential.

[and] dispositions. I'm very heavily involved with workouts and I'm one of the main client -- one of the main people who interacts with clients from the management team." Moreover, Gupta testified that, in January 2017, Orianna informed Omega that it was not able to pay rent to Omega. Specifically, Gupta testified Harris Schwartzberg called Defendant Pickett in January 2017, and mentioned on that call that "that things are really bad. . . . We're going to have tough time making January's rent." Gupta testified that between January and September 2017 "[t]he debtors were not paying Omega any rent" and Omega was "in discussions with [Orianna] with regard to the unpaid rent" and Orianna's performance, "trying to figure out a way to make it all work without restructuring." Gupta referred to Orianna's and Omega's efforts between January 2017 and September 2017 the "workout mode" and, mentioned that in September 2017, Omega had shifted to "restructuring mode," which Gupta described as "when it got to the, now we need to restructure or something really bad is going to happen." In fact, Gupta stated that "Orianna presented to us their outstanding liabilities all across-the-board. And we go, this will never work."

139.    Regarding how the dialogue between Omega and Orianna came about, Gupta stated that "Omega regularly monitors our operators, the financial performance of our operators. So the performance of Orianna had been slipping even well into 2016, but it never came to an issue where they would not be able to pay us rent." Gupta also testified that "[w]e were discussing with them why performance was down. We were having regular meetings. We were trying to understand what was going on." Gupta stated that "[i]t had never gotten to the point where they were not going to be able to pay us rent until January of 2017." When asked whether Orianna's "inability or not paying rent, did that continue through 2017," Gupta responded, except "some very small partial payments," "yes." When asked "[b]ut they were not able to satisfy the full monthly rent at any time," Gupta answered, "not even close."

140.     Gupta also testified that in or around September 2017, Ankura, on Orianna's behalf, "presented to us kind of a balance sheet that showed their liabilities, what was out there. And you put that on top of all the rent they owed us, we knew this wasn't going anywhere good."

141.     However, Gupta testified that, even prior to Ankura's presentation, "we had monthly financial statements. . . [f]or each of the facilities, which we then put into our own systems here at Omega and we analyzed them and kind of do a – we do various testing." Gupta continued, testifying "[b]ut one of – the most important one is a rent coverage ratio to make sure there is ample bottom-line income to cover our rent." Gupta stated that in "late 2015" Omega observed Orianna's "slipping" performance by way of "slippage" in Orianna's rent coverage ratio, or "EBITDAR[12] divided by rent."

142.     Gupta testified that Orianna's "[p]erformance was declining at the facilities. Census was down. Revenue was down. Payor mix was down. Overall performance was down." Regarding whether Orianna's condition improved in 2017, Gupta stated, "I don't remember on a month to month basis. There may have been some ups and downs, but nothing where it was getting back to normal levels."

143.     To pay the rent due for the first fiscal quarter 2017, Orianna offered that Omega take Orianna's security deposit as payment, an offer which Omega declined. Specifically, Gupta confirmed that Harris Schwartzberg questioned, "can you use our security deposit?" and Gupta and Defendant Pickett replied "[n]o. It's your call if you want to pay us rent or not, but we're not using your security deposit."

---

[12] EBITDAR refers to earnings before interest, taxes, depreciation, amortization, and rent/restructuring costs.

144.    In a deposition taken by the Unsecured Creditors Committee on September 12, 2018, Defendant Pickett testified that "[s]ometime in very late 2016 or early 2017 was the first indication we had that Orianna might have difficulty making their monthly rent payment" to Omega. Although Pickett stated that he did not "remember specific dialogue" he did testify that he was he was aware, around that time, that Orianna did not pay rent in January 2017. Defendant Pickett further testified that in early January 2017, "we were engaged in active discussions with the management team at Orianna about their ability to pay, the nature of their issues, what the solutions might be."

145.    Pursuant to the master lease agreements, Orianna was required to pay rent "in advance in consecutive monthly installments payable on the first day of each month during the Term commencing on the Commencement Date." Therefore, Omega and Defendant Pickett, himself, as he admitted, knew that Orianna failed to pay rent at least by early January 2017.

### Omega Intervenes in Orianna's Liquidity Crisis

146.    Pickett stated that, during that time, Orianna remained "optimistic that they would be able to improve performance of that portfolio. They, in particular, pointed out," he stated, "struggles in the Northwest Portfolio, which was its own separate lease of the four leases within Orianna." Additionally, Defendant Pickett also testified that Orianna "expressed some concern around the Texas Portfolio and indicated a high level of optimism that they had taken steps to improve the cash flow of the balance of the portfolio."

147.    Defendant Pickett stated that sometime in the first fiscal quarter of 2017, "we agreed that we would sell or release the Northwest Portfolio, which they indicated was a significant drain on cash. We would look at permanently moving the Texas Portfolio out; and that with those

things and the operational improvements," Orianna communicated to Omega, "they felt they could make, they would be back on track to pay full rent."

148.    Gupta's testimony substantiated that in early January 2017 Orianna "started giving us proposals of ways to fix the problem, but it took us a few months to get our arms around that. We started asking for tons of facts, tons of information. We started asking for payables, balance sheets, management fee schedules, intercompany payments, distributions." Gupta stated, "[w]e wanted to know what was going on because they were asking for a note from us, a second AR note, which becomes a working capital note later on in this story." According to Gupta, Orianna requested a loan from Omega, but "we go, no money. We need to know what's going on first."

149.    In his testimony, Gupta stated that Orianna sought monies to resolve the liquidity issues it was facing, including "selling off the Northwest; keep doing some of this other stuff; this will all come together with these different pieces." Gupta explained that Orianna suggested that in exchange for a loan from Omega, the note "would be collateralized by a second position in the AR.[13] You know, we-could look at the borrowing base that we had with Sterling [National Bank] and notice that there was additional receivables there. So they're offering the receivables post Sterling as collateral."

150.    Therefore, although Pickett and Gupta both testified about Omega's worsening financial condition and efforts to resolve its liquidity issues during the first quarter of 2017 and their involvement in same, the Company did not disclose publicly Orianna's circumstances until May 2017. At that time, as Orianna was negotiating to hire Ankura and Robichaux (and did hire Ankura on May 8, 2017), as detailed herein, Defendant Pickett claimed that he and the Omega

---

[13] "AR" refers to accounts receivable.

team "spent an enormous amount of time understanding the plan," and that they "f[elt] pretty comfortable that [Orianna is] going to come back with coverages at their previous level. . . ."

151.    Gupta testified that Omega "ha[d] experience with Ankura" and that Omega "wanted somebody in to kind of help fix the problems." Accordingly, together, with Defendant Pickett's and the Omega team's informed consent, Orianna engaged Ankura to help solve its financial difficulties that the Individual Defendants had already publicly asserted that Orianna had a plan to fix, that the Individual Defendants had "spent an enormous amount of time understanding that plan," and that they were "comfortable" that Orianna's plan would be effective in producing beneficial results.

152.    Further, Gupta and Defendants Pickett and Booth were involved in dialogues with Ankura about Orianna's financial situation upon hiring Ankura in early May 2017. Gupta testified that his impression of the Company's communication with Ankura during the first half of 2017 "was a matter of always just understanding what's going on to change things; what's the outlook; what's going to happen?" Gupta also stated that he could not recall any conversation with Ankura prior to September 2017 relating to "potential restructuring alternatives or financing."

153.    However, in fact, Gupta did remember that between January 2017 and September 2017, "there was always discussions about transferring assets . . ., various ideas that came along moving certain facilities to certain different operators or even to other affiliated entities of Orianna such as Gulf Coast." Gupta also stated that "in an ideal world, Omega would have loved to just take these buildings all back and release them to new operators. We would have done it months ago." However, Gupta testified that evict an operator from a skilled nursing facility "is not an easy process. . . . [F]or this many buildings in this many states, it would take months and millions of dollars to get them out, including evictions." Gupta further stated that "[i]nstead of going up

against Orianna and trying to kick them out of all of these buildings, let's come up with a plan with them. Maybe recoup some of our investment and release some of the buildings."

154.    Regarding Omega's objective as the "workout mode" morphed into the "restructuring mode," Gupta asserted that:

> The goal of Omega's -- the primary goal was to release every building so we could start getting rent back in the door. Orianna is one of our largest operators. So the moment they stopped paying us rent, it was bad. So our number 1 goal has always been to put our buildings back to works and start collecting rent again. Ideal world, we would have done that with every building. But we knew that was going to be a big fight. So instead, we're like, let's see what they have to offer. Let's see if we can figure this out so we don't have to get into an endless legal battle.

155.    Prior to the May 4, 2017 Earnings Call, the Individual Defendants were aware that not only that Orianna had not paid rent to Omega year-to-date but also that the Company, through a subsidiary, OHI Asset RO, LLC, surreptitiously supplied Orianna with a "Working Capital Loan," on May 2, 2017 and failed to disclose Working Capital Loan to the market. In Orianna's motion that it filed on March 6, 2018 which sought to secure post-bankruptcy-petition financing ("DIP Financing Motion"), Oriana characterized the Working Capital Loan as follows:

> Pursuant to the Working Capital Loan Agreement, dated May 2, 2017 (the "Working Capital Loan Agreement" and together with all related agreements, documents, and instruments, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Working Capital Documents" and, together with the Master Lease Documents, the "Prepetition Documents"), OHI Asset RO, LLC, as lender (the "Working Capital Lender" and collectively with the Master Lease Parties, the "Prepetition Secured Parties"), which is an Omega Party, provided an $18.8 million line of credit to the Debtors listed as "Borrowers" on Schedule 2 thereto (the "Working Capital Debtors") for working capital expenses (the "Working Capital Loan"). ***Most of the proceeds of the Working Capital Loan were used by the Debtors to pay rent and real property taxes*** with the remainder used for other Debtor operating expenses. ***As of the Petition Date, the outstanding principal balance under the Working Capital Loan Agreement is approximately $15 million*** (together with all other amounts incurred. or accrued prior to the Petition Date, the "Working Capital Obligations").

(Emphasis added.)

156.     Orianna made a $15 million draw on the Working Capital Loan which obligated Orianna to pay Omega once-a-month no less than half of the interest accrued at a 9% rate on the outstanding principal, including unpaid interest, in the preceding month. Although Orianna made payments to Omega on certain interest payments, it did not make any payments to pay down the $15 million principal on the Working Capital Loan.

157.     In effect, without informing the market, Omega lent Orianna $15 million to pay rent back to Omega. Significantly, Gupta testified, "[h]ad Omega not made that working capital loan to [Orianna]," it would not "have been in a position to pay rent to Omega" and, even still, Gupta stated "that was a very small partial payment based on everything that was due to [Omega]. By no means was it like, now we're back on track. It was just one piece of trying to help solve their puzzle." To be sure, as of March 6, 2018, when Orianna filed its bankruptcy petition, Orianna's "Prepetition Unpaid Rent & Expenses" totaled $53,306,834.11 and $15,241,670.33 remained outstanding on the Working Capital Loan.

158.     Upon information and belief, Omega either made the $15 million loan to Orianna by drawing on its cash on hand, or its own revolving line of credit[14] since, as of March 31, 2017, Omega's cash or cash equivalents totaled $40,349,000 and its outstanding balance on its revolving line of credit equaled $123,000,000 compared to $21,031,000 and $155,000,000, respectively, as of June 30, 2017. Therefore, the Working Capital Loan measured to approximately 46.6% of Omega's available cash, or 12% of its outstanding balance on its revolving credit line.

159.     Although the Individual Defendants caused Company to fail to disclose the Working Capital Loan that Omega made to Orianna, they did choose to disclose another working

---

[14] Omega lists OHI Asset RO LLC as a direct or indirect wholly owned subsidiary and claims to eliminate intra-company transactions in consolidating its financial statements.

capital loan that Omega had made to Signature, another one of its major operators that had been struggling, before that loan was even closed or funded. The Company's annual report, filed with the SEC on February 23, 2018 (the "2017 10-K"), stated:

> A second operator, Signature Healthcare ("Signature") has also fallen more than 90 days past due on rent, we believe primarily as a result of restrictions on their borrowing capacity and significant professional and general liability claims. A large majority of Signature's past due rent is covered by a letter of credit in excess of $9.0 million and guarantees from the principals of Signature. Despite their current liquidity concerns, we believe we have a path to continue our long standing relationship with Signature under a long term consensual restructure outside of a court-involved restructuring that involves multiple third-party constituents (i.e., Sabra Heath Care REIT, Inc., the United States Department of Justice, and other third-party claimants). ***We are working towards finalizing a comprehensive settlement agreement amongst Signature and their three primary landlords which will effectively bifurcate each of the three portfolios into three distinct legal silos and separate virtually all legal obligations. As part of this agreement, Omega has agreed to defer certain rent payment obligations and provide for a working capital loan***. While we cannot predict the final outcome with these third-party constituents, we are optimistic that an out of court restructure can be realized.

(Emphasis added.)

160.    Accordingly, by February 8, 2017, the Individual Defendants knew or recklessly disregarded that Orianna had failed to pay rent year-to-date, Orianna, exclusive of the Working Capital Loan, could not afford to pay future rent to Omega or real estate taxes on its skilled nursing facilities, and that things would only get worse for Orianna given the rent increase on the South East Master Lease that was set to take effect on January 1, 2018. The Individual Defendants caused the Company to make the Working Capital Loan to Orianna and knowingly or recklessly failed to disclose that loan to the market so as to avoid disclosing Orianna's failure and inability to pay Omega rent, in default of the master leases, and the material adverse impact that would have on Omega's financial results.

**The Individual Defendants' Duty to Disclose**

161.    SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies with respect to their finances and operations. Specifically, Item 303 of Regulation S-K requires that all Form 10-Qs and 10-Ks filed with the SEC include a "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") section. Item 303(a)(3) provides that the MD&A section must:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

162.    Paragraph 3 of the Instructions to Item 303(a) further provides the following:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

163.    As such, the Individual Defendants had a duty under Item 303 of Regulation S-K to disclose that Orianna had not made any rent payments in 2017, Omega made the Working Capital Loan to Orianna, which allowed Orianna to make rent payments to the Company and, in turn, let Omega report its own cash as FFO, which, otherwise, would have suffered a material decline. Accordingly, Orianna's deteriorated financial condition and operational issues and also

the Working Capital Loan constituted (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition;" (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations;" and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

164. In addition, Rule 10-01 of SEC Regulation S-X, 17 C.F.R. § 210.10-01(a)(5), obligates registrants to provide in their interim financial statements "disclosure . . . where events subsequent to the end of the most recent fiscal year have occurred which have a material impact on the registrant." Likewise, pursuant to Generally Accepted Accounting Principles, Accounting Standards Codification ("ASC") 855-20-20 and ASC 855-10-50-20 require disclosure in the notes to the financial statements of a "nonrecognized subsequent event," an event "provid[ing] evidence about conditions that did not exist at the date of the balance sheet but arose subsequent to the" reporting period "of such a nature that [it] must be disclosed to keep the financial statements from being misleading." Therefore, the Individual Defendants had a duty to cause the Company to disclose all material facts related to Orianna's financial troubles, and, particularly, the Working Capital Loan, due to its impact on Orianna's ability to pay rent and, in turn, Omega's financial results for the first and second fiscal quarters of 2017.

**<u>False and Misleading Statements</u>**

***February 8, 2017 Press Release***

165. On February 8, 2017, the Company filed a Form 8-K with the SEC, which attached a press release issued the same day as Exhibit 99.1 announcing financial results for the fourth quarter, ended December 31, 2016, and boasting of increased dividends for the 18th consecutive

quarter ("the February 2017 Press Release"). The Form 8-K was signed by Defendant Stephenson.

The February 2017 Press Release stated, in relevant part:

> Omega's CEO, Taylor Pickett, said, "Our record quarterly Adjusted FFO of $0.88 per share and FAD of $0.80 per share is a strong testament to the strength of our operating model against the backdrop of an increasingly difficult operating environment. We share the industry leadership and investor concerns that increasing labor and liability costs and evolving reimbursement models may put near term financial strain on many operators within our industry." Mr. Pickett, continued, "In light of these concerns, we are pleased to have built a conservative balance sheet allowing us to manage through this uncertainty while delivering superior earnings and reliable dividends."

* * *

> During the fourth quarter of 2016, the Company sold 18 facilities for approximately $104.8 million in net proceeds recognizing a gain of approximately $30.3 million. Eleven of the sold facilities were previously classified as assets held for sale. No provisions for impairment were recorded in the fourth quarter of 2016. The Company's strategy to prune underperforming assets and non-strategic relationships resulted in the sale of 38 facilities for $169.6 million in cash proceeds resulting in a gain of $50.2 million for the year ended December 31, 2016. As part of that process, the Company recorded $58.7 million of asset impairments in 2016.

### *February 9, 2017 Earnings Call*

166. On February 9, 2017, the Company held an earnings call in connection to the release of Omega's financial results for the period ended December 31, 2016. During the call, in response to a question regarding discussions with Signature, one of the Company's largest tenants, related to "rent relief or rent cuts" from Juan Sanabria, an analyst at Bank of America Merrill Lynch, Defendant Stephenson responded:

> We've had ongoing conversations with Signature but we've had no conversations about any rent relief or rent cuts. We've had conversations with -- and I really hate to highlight individual names, but with Signature and with a lot of our other operators, quite frankly, about what can we do -- we talked about repositioning of our portfolio, what can we do to help them and whether it involves perhaps the sale of a few buildings that don't otherwise fit into their markets or their portfolio to a third party. If it involves the releasing of some of their facilities to another party, maybe even a closure of a building in the worst-case scenario. Those are the type of things that we're talking about with Signature and with a couple of other

operators quite frankly. And that's what we will continue to do in 2017.

167.     Also on the call, Michael Gorman, an analyst, asked "given some of the stresses on the operators right now, Bob, there hasn't been any change in terms of reserving against any straight-line receivables or anything, correct?" and Defendant Stephenson answered, "No. No changes at all."

168.     Further, Defendant Pickett engaged in the following exchange with Michael Knott, an analyst from Green Street Advisors, regarding coverage ratios:

> Michael Knott: Just on coverage to touch on that again. Taylor, it seems like you're suggesting that maybe we will get down to the high 1.2 range but maybe not much lower than that. Just hoping you can help me understand how it might not be worse than that just based on the roughly 10 bits of decline we've seen in the last several quarters.
>
> Taylor Pickett: I think part of it is the decline hasn't been at the revenue line. ***Our operators have managed to maintain relatively flat census. So that's an important component and then you look at the expense side of the equation and it's tough to predict labor but there's nobody in our group of operators same labor is going to be a 5% component increase. That it's continued to put pressure on as. So as long as census continues to hold up and we think it should, then it's really managing the expense side of the equation and these guys are pretty effective at it but that's not to say that labor will not continue to pressure them throughout the year.***

(Emphasis added.)

169.     On the call, Nick Yulico ("Yulico") an analyst from UBS questioned "going back to the idea that your operators may face more strain , if we go to your tenant buckets and the 27% of your rent where coverage is below 1.2 , are you having conversations with these operators about rent relief are lower escalators." Defendant Pickett replied:

> No and no. I think I went through some detail what we're going through with these operators which is how do call our reposition some of assets within their portfolios. Which in effect has the effect of reducing rent to some degree and to the extent that you selloff will give their buildings and you provide them with the rent cut that's equal to the amount of the sale proceeds times some cap rate call it 9%. So in that way yes, they would get a rent cut and it does ultimately benefit them. And it takes

away some of their time that there focused on facilities that might otherwise be taken up in undo amount of their time. We're having those conversations. That's constantly.

***February 24, 2017 Form 10-K***

170.    On February 24, 2017, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2016 with the SEC (the "2016 10-K"), signed by Defendants Pickett, Stephenson, Korman, Bernfield, Bobins, Callen, Hill, Kloosterman, Lowenthal, Perks, and Plavin, reaffirming the Company's characterization of its financial results in the February 2017 Press Release.

171.    Attached to the 2016 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Pickett and Stephenson attesting to the accuracy of the 2016 10-K.

172.    In the general Risk Factors section, the 2016 10-K stated the following:

Following are some of the risks and uncertainties that could cause the Company's financial condition, results of operations, business and prospects to differ materially from those contemplated by the forward-looking statements contained in this report or the Company's other filings with the SEC. These risks should be read in conjunction with the other risks described in this report, including but not limited to those described in "*Taxation*" and "*Government Regulation and Reimbursement*" under "*Item 1*" above. The risks described in this report are not the only risks facing the Company and there may be additional risks of which the Company is not presently aware or that the Company currently considers unlikely to significantly impact the Company. Our business, financial condition, results of operations or liquidity could be materially adversely affected by any of these risks, and, as a result, the trading price of our common stock could decline.

173.    Regarding "Risks Related to the Operators of [Omega's] Facilities," the 2016 10-K stated the following:

Our financial position could be weakened and our ability to make distributions and fulfill our obligations with respect to our indebtedness could be limited if our operators, or a portion thereof, become unable to meet their obligations to us or fail to renew or extend their relationship with us as their lease terms expire or their

mortgages mature, or if we become unable to lease or re-lease our facilities or make mortgage loans on economically favorable terms. We have no operational control over our operators. Adverse developments concerning our operators could arise due to a number of factors, including those listed below.

***The bankruptcy or insolvency of our operators could limit or delay our ability to recover on our investments.***

We are exposed to the risk that a distressed or insolvent operator may not be able to meet its lease, loan, mortgage or other obligations to us or other third parties. This risk is heightened during a period of economic or political instability. Although each of our lease and loan agreements typically provides us with the right to terminate, evict an operator, foreclose on our collateral, demand immediate payment and exercise other remedies upon the bankruptcy or insolvency of an operator, title 11 of the United States Code (the "Bankruptcy Code") would limit or, at a minimum, delay our ability to collect unpaid pre-bankruptcy rents and mortgage payments and to pursue other remedies against a bankrupt operator. While we sometimes have third party guarantees of an operator's lease or loan obligations, such guarantees can be expensive to enforce, and have their own risks of collection as against the guarantors.

174.    The 2016 10-K stated the following with respect to its direct finance lease with

Orianna:

On November 27, 2013, we closed an aggregate $529 million purchase/leaseback transaction in connection with the acquisition of Ark Holding Company, Inc. ("Ark Holding") by 4 West Holdings Inc. At closing, we acquired 55 SNFs and 1 ALF operated by Ark Holding and leased the facilities back to Ark Holding, now known as New Ark Investment Inc. ("New Ark"), pursuant to four 50-year master leases with rental payments yielding 10.6% per annum over the term of the leases. The purchase/leaseback transaction is being accounted for as a direct financing lease.

The lease agreements allow the tenant the right to purchase the facilities for a bargain purchase price plus closing costs at the end of the lease term. In addition, commencing in the 41st year of each lease, the tenant will have the right to prepay the remainder of its obligations thereunder for an amount equal to the sum of the unamortized portion of the original aggregate $529 million investment plus the net present value of the remaining payments under the lease and closing costs. In the event the tenant exercises either of these options, we have the right to purchase the properties for fair value at the time.

The 56 facilities represent 5,623 licensed beds located in 12 states, predominantly in the southeastern United States. The 56 facilities are separated by region and

divided amongst four cross-defaulted master leases. The four regions include the Southeast (39 facilities), the Northwest (7 facilities), Texas (9 facilities) and Indiana (1 facility).

Additionally, we own four facilities and lease them to New Ark under a master lease which expires in 2026. The four facility lease is being accounted for as an operating lease.

175.    Regarding internal controls, the 2016 10-K stated:

In connection with the preparation of our Form 10-K, our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2016. In making that assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control-Integrated Framework ("2013 framework"). ***Based on management's assessment, management believes that, as of December 31, 2016, our internal control over financial reporting was effective based on those criteria***.

\* \* \*

There were no changes in our internal control over financial reporting during the quarter ended December 31, 2016 identified in connection with the evaluation of our disclosure controls and procedures described above that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

### *May 3, 2017 Press Release*

176.    Omega filed a press release on May 3, 2017, providing financial results for the first

quarter, ended March 31, 2017, and boasting an increased dividend rate for 19th consecutive quarter

(the "May 2017 Press Release"). That May 2017 Press Release stated, in relevant part:

### GAAP NET INCOME

For the three-month period ended March 31, 2017, the Company reported net income of $109.1 million, or $0.53 per common share, on operating revenues of $231.7 million.  This compares to net income of $58.2 million, or $0.29 per common share, on operating revenues of $212.9 million, for the same period in 2016.

The increase in net income for the three-month period ended March 31, 2017

compared to the prior year was primarily due to revenue associated with new investments completed in 2016, a one-time contractual settlement in 2017 and the reduction in impairments on real estate assets and acquisition costs.  This increase in net income was partially offset by $7.6 million in increased depreciation and amortization expense, $1.1 million in incremental general and administrative expenses and $1.0 million in increased stock-based compensation expense.

\* \* \*

**Funds From Operations** – For the three-month period ended March 31, 2017, FFO[15] was $181.0 million, or $0.88 per common share on 206 million weighted-average common shares outstanding, compared to $153.6 million, or $0.77 per common share on 198 million weighted-average common shares outstanding, for the same period in 2016.

### *May 4, 2017 Earnings Call*

177.    The next day, on May 4, 2017, the Company held an earnings call in connection to the release of its financial results for the period ended March 31, 2017. During the call, regarding Orianna, Defendant  Booth stated the following:

As of March 31, 2017, Omega had an operating asset portfolio of 972 facilities, with approximately 99,000 operating beds.

These facilities were spread across 77 third-party operators and located within 41 states and the United Kingdom. Trailing 12-month operator EBITDARM and EBITDAR coverage for our portfolio increased slightly during the fourth quarter of 2016 to 1.69x and 1.33x, respectively versus 1.68x and 1.31x, respectively for the trailing 12-month period ended September 30, 2016. The pressures on portfolio performance experienced in 2016, such as increased labor costs and decreased lengths of stay have begun to show some signs of stability in the fourth quarter results, as well as year-to-date results in the first quarter.

***One private top 10 operator, of note, however, felt the performance pressure more than most. This was exacerbated in 2016 by complete replacement of senior management early in the year.***

---

[15] The 2016 10-K defined FFO as "net income (computed in accordance with GAAP), adjusted for the effects of asset dispositions and certain non-cash items, primarily depreciation and amortization and impairment on real estate assets, and after adjustments for unconsolidated partnerships and joint ventures."

*The new management team well known and respected by Omega worked throughout 2016 to transform the culture of the company, which included changing out many facility-level management teams. During this transition period, the company's operational performance suffered such that the portfolio dipped below 1x EBITDAR coverage for the trailing 12 months ended December 31, 2016.*

In an *effort to assist* the company during this transitional period, Omega embarked on an effort to sell off the company's northwest region, which consisted of 7 facilities. This region has struggled of late and given its geographical remoteness, has been difficult to oversee.

We anticipate the sale of all 7 facilities in that region to be completed by the second quarter of 2017, with 3 facilities having already been sold.

(Emphasis added.)

178.    Also on the call, Defendant Pickett and Yulico had the following exchange:

Nicholas Yulico - UBS Investment Bank, Research Division - Executive Director and Equity Research Analyst- REIT's: Okay. And so going back to this tenant who is not current on rent, sounds like they missed a rent payment in the first quarter. I'm confused as to why then your guidance for the year doesn't get reflected? Why wasn't the guidance reduced if you have a tenant that's not paying rent? And still hasn't paid rent?

Pickett: Well, it's -- well, *they're 45 days past due*, so it's a month and a half. We spent an enormous amount of time understanding the plan, and we look at Q1 with 1.09 coverage. Once the Northwest sale is executed, which we're halfway through, and we look at their plan going out throughout the rest of the year, and it's pretty clear if they hit their plan that we're going to be back to current. *But frankly, at 45 days past due, to start fiddling around with guidance, just doesn't make any sense, we feel pretty comfortable that they're going to come back with coverages at their previous level, which is* (inaudible).

Nicholas Yulico: Okay. But just so I make sure I understand this. Even if their coverage comes back, they still missed the whole rent payment, right? So why would their -- just because if their coverage gets -- improves going forward, why does that give you confidence that they'd be able to repay the rent payment that they already missed?

Pickett: Because by definition, if their coverage comes back, they have cash in excess of the rental obligation, which is cash that would then be paid to us. We're first in line, they can't move that cash outside their entity, that depends.

(Emphasis added.)

### *May 5, 2017 Form 10-Q*

179.    The next day, on May 5, 2017, the Company filed its quarterly report for the first quarter on Form 10-Q (the "1Q17 10-Q") with the SEC, signed by Defendants Pickett and Stephenson. The 1Q17 10-Q reiterated the same statements regarding the Company's financial results contained in the May 2017 Press Release.

180.    Attached to the 1Q17 10-Q were SOX certifications signed by Defendants Pickett and Stephenson attesting to its accuracy.

181.    The 1Q17 10-Q stated the following with respect to its direct finance lease with Orianna:

*New Ark Investment Inc.*

On November 27, 2013, we closed an aggregate $529 million purchase/leaseback transaction in connection with the acquisition of Ark Holding Company, Inc. ("Ark Holding") by 4 West Holdings Inc. At closing, we acquired 55 SNFs and 1 ALF operated by Ark Holding and leased the facilities back to Ark Holding, now known as New Ark Investment Inc. ("New Ark"), pursuant to four 50-year master leases with rental payments yielding 10.6% per annum over the term of the leases. The purchase/leaseback transaction is being accounted for as a direct financing lease.

The lease agreements allow the tenant the right to purchase the facilities for a bargain purchase price plus closing costs at the end of the lease term. In addition, commencing in the 41st year of each lease, the tenant will have the right to prepay the remainder of its obligations thereunder for an amount equal to the sum of the unamortized portion of the original aggregate $529 million investment plus the net present value of the remaining payments under the lease and closing costs. In the event the tenant exercises either of these options, we have the right to purchase the properties for fair value at the time.

The 56 facilities represent 5,623 licensed beds located in 12 states, predominantly in the southeastern U.S. The 56 facilities are separated by region and divided amongst four cross-defaulted master leases. The four regions include the Southeast (39 facilities), the Northwest (7 facilities), Texas (9 facilities) and Indiana (1 facility).

Additionally, we own four facilities and lease them to New Ark under a master lease which expires in 2026. The four facility lease is being accounted for as an operating lease.

*In March 2017, we executed sale agreements with two unrelated third parties to sell the 7 Northwest facilities with a carrying value of approximately $36.4 million for $34.0 million. As a result, we recorded an allowance for loss of approximately $2.4 million. For the three months ended March 31, 2017, we recognized approximately $0.8 million of direct financing lease income on a cash basis related to the Northwest facilities lease. The sale of these facilities is expected to close in the second quarter of 2017.*

(Emphasis added.)

182.    Regarding the Company's evaluation process for determining Asset Impairment, the 1Q17 10-Q stated the following:

Management evaluates our real estate investments for impairment indicators at each reporting period, including the evaluation of our assets' useful lives. The judgment regarding the existence of impairment indicators is based on factors such as, but not limited to, market conditions, operator performance, legal structure, as well as our intent with respect to holding or disposing of the asset. If indicators of impairment are present, management evaluates the carrying value of the related real estate investments in relation to the future undiscounted cash flows of the underlying facilities. Provisions for impairment losses related to long-lived assets are recognized when expected future undiscounted cash flows based on our intended use of the property are determined to be less than the carrying values of the assets. An adjustment is made to the net carrying value of the real estate investments for the excess of carrying value over fair value. The fair value of the real estate investment is determined by market research, which includes valuing the property as a nursing home as well as other alternative uses. All impairments are taken as a period cost at that time, and depreciation is adjusted going forward to reflect the new value assigned to the asset. Management's impairment evaluation process, and when applicable, impairment calculations involve estimation of the future cash flows from management's intended use of the property. Changes in the facts and circumstances that drive management's assumptions may result in an impairment of the Company's assets in a future period that could be material to the Company's results of operations.

183.    In Note 18, titled "Subsequent Events," the 1Q17 10-Q stated:

On April 4, 2017, we issued (i) $550 million aggregate principal amount of our 4.75% Senior Notes due 2028 (the "2028 Notes") and (ii) an additional $150 million aggregate principal amount of our existing 4.50% Senior Notes due 2025 (the "2025 Notes", and together with the 2028 Notes collectively, the "Notes"). The 2028 Notes mature on January 15, 2028 and the 2025 Notes mature on January 15, 2025.

The 2028 Notes were sold at an issue price of 98.978% of their face value before the underwriters' discount and the 2025 Notes were sold at an issue price of 99.540% of their face value before the underwriters' discount. Our net proceeds from the Notes offering, after deducting underwriting discounts and expenses, were approximately $690.7 million. The net proceeds from the Notes offering were used to (i) redeem all of our outstanding $400 million aggregate principal amount of 5.875% Senior Notes due 2024 (the "2024 Notes") on April 28, 2017, (ii) prepay the $200 million Tranche A-2 Term Loan Facility on April 5, 2017 that otherwise would have become due on June 27, 2017, and (iii) repay outstanding borrowings under our revolving credit facility. As a result of the redemption of the 2024 Notes, during the second quarter of 2017, the Company will record approximately $16.5 million in redemption related costs and write-offs, including $11.8 million for the call premium and $4.7 million in net write-offs associated with unamortized deferred financing costs.

184.    With respect to "Risk Factors," the 1Q17 10-K stated that "There have been no material changes to our risk factors as previously disclosed in Item 1A contained in Part I of our Annual Report on Form 10-K for the fiscal year ended December 31, 2016 and filed with the [SEC] on February 24, 2017."

185.    Regarding internal controls, the 1Q17 10-Q stated:

There were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the period covered by this report identified in connection with the evaluation of our disclosure controls and procedures described above that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### *July 26, 2017 Press Release*

186.    Omega issued a press release on July 26, 2017 after markets closed titled "Omega Announces Second Quarter 2017 Financial Results: Increased Dividend Rate for 20[th] Consecutive

Quarter" (the July 2017 Press Release), announcing the Company's financial results for the quarter

ended June 30, 2017. The July 2017 Press Release stated, in relevant part:

> ***Funds From Operations –*** For the three-month period ended June 30, 2017, FFO
> was $150.9 million, or $0.73 per common share on 207 million weighted-average
> common shares outstanding, compared to $172.3 million, or $0.87 per common
> share on 199 million weighted-average common shares outstanding, for the same
> period in 2016.
> The $150.9 million of FFO for the three-month period ended June 30, 2017 includes
> the impact of $23.5 million of one-time interest refinancing costs, $3.7 million of
> non-cash stock-based compensation expense and $2.7 million in provision for
> uncollectible accounts, offset by $1.9 million of one-time revenue.
>
> The $172.3 million of FFO for the three-month period ended June 30, 2016 includes
> the impact of a $5.4 million cash receipt related to early termination of mortgages,
> $3.7 million of non-cash stock-based compensation expense, $3.5 million of
> acquisition costs and a $1.2 million adjustment (recovery) related to the provision
> for uncollectible accounts.
>
> Adjusted FFO was $179.0 million, or $0.87 per common share, for the three months
> ended June 30, 2017, compared to $173.0 million, or $0.87 per common share, for
> the same period in 2016.  For further information see the "Funds From Operations"
> schedule.

### July 26, 2017 Reports

187.    Also on July 26, 2017, Yulico published a report sub-titled "Top 10 Tenant Still

Behind on Rent" regarding Omega's upcoming conference call scheduled for the following day.

In the report, Yulico stated that he anticipated that the Company would address, among other

issues, matters relating to "top operators [Orianna] and Signature among others." Specifically,

Yulico's report stated the following, in relevant part:

**Q: What do 2Q results mean for the stock?**

Tenant operating metrics looked similar for 2Q vs. 1Q; however, one top tenant
(New Ark, 6.4% of rent) remains under 1x EBITDAR coverage and late on rent
(beyond 30 days). We look to hear more about what payments (if any) were
recouped from New Ark after 1Q shortfall. A smaller portion of rent (0.2), an add'l
SNF w/ coverage below 1x, is also now behind in rent. OHI removed its cash flow
statement from the supplemental; this comes after 1Q when operating cash flow
growth underperformed EBITDA and FFO/FAD because of missed rent payments.
We note ytd accounts receivable growth (+30% y/y) is meaningfully outpacing

revenue growth ytd (6% y/y), which may signal increased mismatch on rent collections. We continue to think the skilled nursing industry is facing meaningful headwinds from bundling programs, CJR, and shifts to Medicare Advantage. OHI has the highest SNF exposure (~90% of NOI) in our coverage.

188.    Michael Gorman, an analyst at BTIG also wrote a report on July 26, 2017 in anticipation of Omega's earnings call. Gorman's report, titled "Omega Healthcare Investors Reports Adjusted FFO of $0.84, But Tenant Health Remains the Focus; Maintain Neutral" stated:

> Omega reported 2Q17 FFO/sh of $0.84 after adjusting for one-time refinancing expenses during the quarter. The result compares to our estimate of $0.85 and the consensus of $0.83. Management narrowed its 2017 adjusted FFO guide to $3.42-$3.44 from $3.40- $3.44 previously. However, tenant health within the portfolio remains an issue as tenants representing more than 10% of revenue have an EBITDAR coverage below 1.0x, and tenants representing 6.6% of revenue are more than 30-days delinquent on rent. We maintain our Neutral rating.
>
> • Omega's adjusted FFO of $0.84 missed our estimate by $0.01. Relative to our model NOI, mortgage interest income, and provisions for uncollectible accounts all drove the lower result.
>
> • Management adjusted its 2017 FFO/sh guidance range to $3.42-$3.44, raising the midpoint $0.01 from the prior range. The new $3.43 midpoint compares to our estimate of $3.41 and the consensus of $3.39. However, we would note that management's guidance includes certain add-backs that we exclude from our estimates.
>
> • Tenant health remains an issue for the portfolio. While EBITDARM coverage levels were flat sequentially at 1.69x, they were down from 1.75x in the prior-year period. Moreover, 11 tenants representing 10.3% of revenue carry an EBITDAR coverage ratio of less than 1.0x. While this is roughly in line with the 10.4% from 1Q17, we would note that two of those tenants, representing 6.6% of rents, are now more than 30-days late on their rental payments. We believe this highlight potential material risks to the near-term income stream.

Therefore, analysts that had been tracking the Company pointed out that financial circumstances of Omega's tenants, and specifically Orianna, was vital to the Company's FFO.

189.    The statements in ¶¶ 165-188 were materially false and misleading, and/or failed to disclose material facts necessary to make the statements made not false and misleading.

Specifically, the Individual Defendants failed to disclose: (1) the deteriorating financial and operating results of certain of Omega's operators, including Orianna; (2) the resulting diminished liquidity of those operators, including Orianna, and its impact on their ability to make timely rent payments; (3) that as a result, certain of Omega's direct financing leases were impaired and certain receivables were uncollectible; (4) the Individual Defendants caused Omega to become directly involved in Orianna's attempt to stabilize its financial condition and, as a result, Omega provided the Working Capital Loan to Orianna; (5) thereafter, whatever rent payments Orianna made to Omega was a direct result from the monies Orianna received from the Working Capital Loan that Omega provided to Orianna; and (6) that Omega failed to maintain internal controls; and (7) that due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and/or lacked a reasonable basis in fact.

### The Truth Begins to Emerge as False and Misleading Statements Relating to Orianna's Financial Condition and the Working Capital Loan Continue

*July 27, 2017 Earnings Call*

190.    The following day, July 27, 2017, Omega held a conference call regarding the Company's financial results for the second quarter of 2017. During the call, Defendant Booth noted issues with some of the Company's operators' liquidity:

> While we're cautiously optimistic that portfolio-wide coverages have stabilized, we continue to see certain regional operators struggle with various operational pressures, including a tight labor market, length of stake compression and an increase in PL/GL claims.
>
> Two our top 10 private operators in particular have seen margins and coverages decline and has a result create liquidity concerns. The first of these private operators, and one which we discussed on our last earnings call, has continued to experience the quarterly pressures, despite finally showing signs of operations improvements. Coverage for the trailing 12-months ended March 31, 2017, remained slightly below 1x. However, results for the standalone first quarter was 1.12x and year-to-date results through May remained consistent.

191.    Defendant Booth continued by noting attempts the Company was making to alleviate the issue with one of its operators:

> Efforts to manage previous operational pressures have included the following initiatives: replacing the entire executive management team, including a very recent and significant downsizing of both corporate and regional staff; establishing a new disciplined corporate culture, which involves replacement of majority of facility level management; rebranding its corporate identity; revising its mission statement; and implementing new business practices; negotiating numerous vendor contracts; and lastly, establishing a centralized referral network.
>
> Additionally, Omega has helped concentrate this operator's geographic footprint by selling off 6 of the 7 Northwest facilities to third-party operators. One remaining facility in the Northwest is expected to be sold on August 1st, pending regulatory approval. Omega has also transitioned this operator's entire Texas region, which consisted of 9 facilities, to another existing Omega tenant.
>
> We're cautiously optimistic that the combination of these efforts will result in steadily improving margins and eventually return to its former profitability. However, in the meantime, our past due rent has reached nearly 90 days in arrears. As such, any further deterioration and/or the failure of tenant to achieve its budgeted plan may result in cash basis accounting and a potential review of the value of these capital lease assets.

192.    During the question and answer portion of the call, Yulico and Defendant Pickett had the following exchange:

> **Yulico**: And then, just want to go back to the operator -- the second operator you talked about, the one that's restructuring, I mean, there's been -- this has been news about Signature in the press about that they do have a working capital loan out. And so I'm wondering, if you -- if one of the steps of relief in a restructuring, would you be willing to step in as a working capital lender to this tenant in case they cannot get their current lender to restructure?
>
> **Pickett**: Something that we haven't talked about, Nick, but it's something -- we've been through dozens of these and occasionally that is part of the solution. So it hasn't been discussed. But if it's part of the solution that makes sense, then we'd probably go down that pathway.

193.    In response, the Company's stock dropped $1.35, or 4%, to close at $32.10 on July 27, 2017, on unusually heavy trading volume.

*August 9, 2017 Form 10-Q*

194.     On August 9, 2017, the Company filed its quarterly report for the second fiscal

quarter ended June 30, 2017 on Form 10-Q (the "2Q17 10-Q") with the SEC, signed by Defendants

Pickett and Stephenson. The 2Q17 10-Q reiterated the same statements regarding the Company's

financial results contained in the July 2017 Press Release.

195.     Attached to the 2Q17 10-Q were SOX certifications signed by Defendants Pickett

and Stephenson attesting to its accuracy.

196.     Regarding the Company's issues relating to Orianna and Signature, the 2Q17 10-Q

stated the following:

> At June 30, 2017, two of our top 10 operators were approximately 90 days past due
> on rent payments to the Company. One of these operators has been facing liquidity
> pressures following a management transition, but has been showing signs of
> operational improvement and is currently making partial monthly rent payments.
> The current management of this operator is pursuing operational improvements,
> such as replacing executive management and senior level management,
> renegotiating vendor contracts and establishing a centralized referral network. The
> Company is working with this operator to concentrate its geographic footprint by
> selling certain facilities, of which five were sold prior to June 30, 2017. The
> Company expects to sell two other facilities and transition its existing Texas
> portfolio to another operator during the third quarter of 2017. The Company is
> optimistic that the combination of these efforts will result in improving margins
> and performance by this operator. The Company is currently recording rental
> revenue from this operator on an accrual basis. The Company continues to monitor
> the operator's operating plan and in the event its performance deteriorates, the
> Company will reassess the carrying value of the portfolio and consider recording
> future rental revenue on a cash basis.
>
> The other operator with approximately 90 days rent past due has been adversely
> affected by an adverse general and professional liability environment in Kentucky
> and is in ongoing discussions to settle matters arising from a U.S. Department of
> Justice investigation. The Company has negotiated a proposed restructuring plan
> with this operator, subject to the operator's resolution of its obligations with other
> landlords and lenders and the Department of Justice investigation. Receivables
> from this operator are backed by a security deposit and guarantees from the
> principals of the operator.

The Company believes the current performance of these two operators primarily reflects specific operator-related or localized issues rather than issues generally impacting the industry. The Company continues to closely monitor the performance of these two operators specifically, as well as industry trends and developments generally.

197. Regarding internal controls, the 2Q17 10-Q stated:

There were no changes in the Companies' internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the period covered by this report identified in connection with the evaluation of our disclosure controls and procedures described above that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

***August 3, 2017 Report***

198. On August 3, 2017, Omotayo Okusanya ("Okusanya"), a Jefferies analyst, published a report which stated the following:

**Key Takeaway**

**Although OHI beat their 2Q17 AFFO/sh guidance and revised their FY AFFO/sh outlook to $3.42-$3.44 from $3.40-$3.44, investors were more concerned with the health of two top ten tenants (Signature Healthcare and Ark) who continue to not be current on their rents. We are increasingly relying on scenario analysis (see below) to assess tenant credit risk and lowering our PT to $32 to reflect our updated base case scenario**.

**Our Base Case ($32 PT, 2017/2018 AFFO/sh $3.37/$3.31, 2017/2018 FAD $3.01/ $2.93):** Our base case scenario has OHI not recouping the $20M of outstanding rents from Ark & Signature. In addition, this scenario includes our view that OHI recognizes just cash rents received going forward given the challenges that these two tenants face. Rent received was $35M in 1H17, which we model as $17.5M per quarter going forward.

**Our Downside Case ($27 PT, 2017/2018 AFFO/sh $3.37/$3.30, 2017/2018 FAD: $3.01/$2.92):** Under this case, both Signature and Ark's financial health deteriorates, causing them both to go bankrupt. We also assume a third tenant (Consulate Healthcare) defaults under this scenario given the recent $347M fraud judgment against it. In the event that this occurs, we see low risk of leases being rejected given current rent coverage (~0.96x at Ark and ~1.3x at Signature). We believe OHI would be able to either renegotiate their leases with Signature & Ark or find new tenants to operate the facilities, where they would be paying rents similar if not more than what Signature & Ark were currently paying. The downside risk comes from bankruptcies driving heightened tenant credit risk, which would

cause valuation multiple compression. Our $27 valuation under this scenario implies a compressed 8.0x P/AFFO multiple, which is warranted as we note SNF focused Healthcare REITs hit historical lows of 4-5x P/AFFO in the late-1990's when several SNF operators were going bankrupt due to a major change in reimbursement policy. Should all three tenants enter bankruptcy, we expect dividend growth would be suspended and the quarterly dividend held at its current rate of $0.64.

199.     The statements in ¶¶ 190-198 were materially false and misleading, and/or failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose: (1) the deteriorating financial and operating results of certain of Omega's operators, including Orianna; (2) the resulting diminished liquidity of those operators, including Orianna, and its impact on their ability to make timely rent payments; (3) that as a result, certain of Omega's direct financing leases were impaired and certain receivables were uncollectible; (4) the Individual Defendants caused Omega to become directly involved in Orianna's attempt to stabilize its financial condition and, as a result, Omega provided the Working Capital Loan to Orianna; (5) thereafter, whatever rent payments Orianna made to Omega was a direct result from the monies Orianna received from the Working Capital Loan that Omega provided to Orianna; and (6) that Omega failed to maintain internal controls; and (7) that due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and/or lacked a reasonable basis in fact.

### *The Truth About Orianna's Financial Condition and the Impact on Omega Emerges*

200.     On October 30, 2017, after markets closed, Omega issued a press release titled "Omega Announces Third Quarter 2017 Financial Results; Increased Dividend Rate for 21st Consecutive Quarter." That press release began with comments regarding financial issues concerning Orianna, one of the Company's top ten operators:

## CEO COMMENTS

Taylor Pickett, Omega's Chief Executive Officer stated, "We are in active discussions with Orianna regarding the transition of some or all of their remaining portfolio to new operators. Since 2014, occupancy in the Orianna portfolio has declined from 92% to 89%. Revenue has grown by 2%, while operating expenses have grown by 6%. We believe that for some of the Orianna facilities new operators may be able to improve occupancy and reduce expenses; however, based on current facility performance, we anticipate that the current annual contractual rent of $46 million will likely be reduced to a range of $32 million to $38 million once the transition process is complete." Mr. Pickett, continued, "The transition timing is expected to take approximately six months."

201.    The press release continued, outlining financial results from the third quarter of

2017:

## THIRD QUARTER 2017 RESULTS

***Operating Revenues and Expenses*** – Operating revenues for the three-month period ended September 30, 2017 totaled $219.6 million which included $13.3 million of non-cash revenue.

***Operating expenses for the three-month period ended September 30, 2017 totaled $307.9 million and consisted of $194.7 million in impairment on direct financing leases related to the Orianna portfolio, $11.9 million in provision for uncollectible accounts ($9.5 million related to Orianna)***, $71.9 million of depreciation and amortization expense, $17.8 million of impairment on real estate properties, $7.7 million of general and administrative expense, and $3.9 million of stock-based compensation expense.

* * *

***Funds From Operations*** – For the three-month period ended September 30, 2017, FFO was a loss of $(46.8) million, or a loss of $(0.24) per common share on 207 million weighted-average common shares outstanding, compared to $162.6 million, or $0.80 per common share on 204 million weighted-average common shares outstanding, for the same period in 2016.

***The $46.8 million loss of FFO for the three-month period ended September 30, 2017 includes the impact of $194.7 million in impairment on direct financing leases, $11.9 million in provision for uncollectible accounts*** and $3.9 million of non-cash stock-based compensation expense.

The $162.6 million of FFO for the three-month period ended September 30, 2016 includes the impact of $3.7 million of non-cash stock-based compensation expense,

$2.3 million of acquisition and merger related costs, $1.8 million of interest refinancing costs and $0.5 million of non-cash revenue.

Adjusted FFO was $163.6 million, or $0.79 per common share, for the three-month period ended September 30, 2017, compared to $169.9 million, or $0.83 per common share, for the same period in 2016. For further information see the "Funds From Operations" schedule.

202.    The press release included comments from Defendant Stephenson, Omega's CFO, concerning the financial impact to the Company as a result of the issues with Orianna:

"During our second quarter earnings call, we stated we were closely monitoring one of our operators and may have to place them on a cash basis for revenue recognition if their performance did not improve. ***Since Orianna did not achieve their revised operating plan and pay their full contractual rent, we placed them on a cash basis*** and therefore our third quarter results, including AFFO and FAD, do not include any revenue related to Orianna." Mr. Stephenson continued, "Since 93% of our Orianna portfolio was classified as a direct financing lease, placing them on a cash basis and initiating the process to transition some or all of their portfolio to new operators also required us to record several large provisions related to the direct financing leases during the quarter."

203.    The press release also provided revised 2017 adjusted FFO guidance, stating, in relevant part:

## 2017 ADJUSTED FFO GUIDANCE REVISED

Bob Stephenson, Omega's CFO commented, ***"We are lowering our 2017 guidance to reflect the temporary loss of third and fourth quarter 2017 revenue primarily related to placing Orianna and a non-top ten operator on a cash basis."***

The Company's revised guidance for 2017 Adjusted FFO is now $3.27 to $3.28 per diluted share. The following table presents a reconciliation of Omega's guidance regarding Adjusted FFO to projected GAAP earnings.

(Emphasis added, except headings.)

204.    On October 30, 2017, Okusanya published a report titled "Omega Healthcare Investors (OHI) 3Q17 Big Miss, Guidance Lowered." The report stated the following:

**Bottom Line:** It was a challenging quarter for OHI given one of its struggling tenants, Orianna (Ark), did not achieve their revised operating plan and pay its full contractual rent. This caused OHI to place the tenant on cash basis accounting and

not recognize any revenue from the tenant in the quarter. The disparity between reported AFFO/sh and our estimates is attributable to the nearly $12M a quarter in rents the company is not recording from Orianna (we had estimated closer to a $10M hit for the entire tenant watch list), as well as higher than expected interest expense ($0.01) and lower interest income ($0.01). OHI has initiated the process to transition some or the entire Orianna portfolio to new operators (see below for further details). After previously raising FY2017 AFFO/sh guidance last quarter to $3.42- $3.44, OHI rolled back its estimates and lowered FY2017 guidance to $3.27-$3.28 in 3Q17. While the tenant issues in the OHI portfolio were made evident to investors in 2Q17, the magnitude of the impairment from Orianna, the lowered full year guidance, and continued concerns about tenant credit risk will likely weigh heavily on the stock tomorrow.

**Orianna Creates Ugly 3Q17 Results:** Given the challenges at Orianna, OHI took a $198M impairment against their $618M investment. As part of the ongoing process of transitioning the portfolio to a new operator, OHI expects annual rents to be reduced from $46M to a range of $32M-$38M, with a six month transition period. This suggests at least a $30M impact ~($0.15 AFFO/sh) to 2018 AFFO/sh. To date, OHI has already transitioned 9 Texas facilities to an existing operator in the OHI portfolio. Lastly, management notes that OHI recorded an $11.9M provision for uncollectible accounts during 3Q17 mainly in relation to Orianna.

Therefore, had the Company not provided a loan to Orianna in May 2017, Orianna would not have been able to pay its quarterly rent and by failing to disclose that loan, Omega was able to avoid informing investors of a $12 million hole in its FFO guidance.

205. The Company held an earnings call the following day, October 31, 2017 (the "October 2017 Earnings Call").

206. During the October 2017 Earnings Call, Defendant Pickett noted reductions in the FFO and FAD for the third quarter:

Adjusted FFO for the third quarter is $0.79 per share. Funds available for distribution, FAD for the quarter is $0.73 per share. ***The reduction in adjusted FFO and FAD is primarily related to converting the Orianna portfolio to cash basis accounting with no adjusted FFO or FAD recognized for Orianna in the third quarter***.

(Emphasis added.)

207.    Defendant Stephenson commented on the lowered FFO guidance for 2017,

attributing it to issues with Orianna:

> Operating revenue for the quarter was approximately $220 million versus $225 million for the third quarter of 2016. ***The decrease was primarily a result of placing Orianna on a cash basis, and therefore, we recorded no Orianna revenue for the quarter.***
>
> \* \* \*
>
> ***We have lowered our 2017 adjusted FFO guidance to $3.27 to $3.28 per share.*** The reduction is primarily a result of two items: first, it reflects the temporary loss of Orianna revenue for both the third and fourth quarters; and second, we placed a non-top 10 operator on a cash basis effective September 1, as their outstanding contractual receivable exceeded our revenue recognition test.

(Emphasis added.)

208.    Defendant Booth further explained the steps taken due to operator performance

issues:

> ***In addition to Orianna, we continue to experience specific operator performance issues, as discussed in our last several calls, including Signature Healthcare, another top ten operator***. In both cases, liquidity issues are impacting the ability of these operators to pay rent on a timely basis.
>
> The first operator, Orianna, ***has fallen significantly behind on rent, and as a result, has been placed on a cash basis accounting, as previously discussed by both Taylor and Bob***. While we have endeavored to assist Orianna in streamlining operations by transitioning both their Northwest and Texas regions, ***the overall portfolio continues to struggle and past due rent has grown***.
>
> Our next step hopefully is to consensually transition the remaining portfolio of 42 facilities by virtue of either asset sales or re-leasing to other operators. While we believe the remaining states are considered very attractive within our industry, ***we expect our contractual rent to decline by a range of between $8 million and $14 million per annum.*** This will result in a pro forma EBITDAR coverage ratio assuming all the facilities are re-leased between 1.2 and 1.5 times given current performance.

(Emphasis added).

209.    Defendant Booth further explained that performance issues were not limited to

Orianna:

*Our second top 10 operator, Signature Healthcare, has also fallen further behind on rent in the third quarter predominantly as a result of anticipated tightening restrictions upon their borrowing base by their working capital lender, thus reducing availability.* At this time, it is important to note that the vast majority of Signature's past due rent balance is covered by a letter of credit in excess of $9 million.

Despite the current liquidity situation, we believe we have a path to continue our longstanding relationship with Signature under a long-term consensual restructure that involves multiple constituents and to keep Signature out of a formal court-involved reorganization. This out-of-court restructuring may involve the following components of consideration, a certain amount of deferred rent, CapEx funds in a working capital line of credit.

This scenario would involve the approval of other third-party constituents, including Signature's other significant landlord, Signature's working capital lender, the Department of Justice and certain other third-party claimants. While we cannot predict the ultimate outcome of these third-party constituent discussions, we feel that we have made significant progress and are optimistic that an out-of-court resolution can be realized.

(Emphasis added).

210.    Defendant Booth also noted that operator performance issues were not limited to the Company's top ten operators:

*In addition to the Orianna and Signature ongoing restructure efforts, we have one other non-top ten operator that has fallen behind on rent, and that has required future rent payments to be placed on cash basis accounting.*

Over the last several months, we have negotiated with a settlement and forbearance agreement with this operator, which will result in rent payments in the fourth quarter to be about approximately 23% less than our current contractual rent. Beginning in January, we expect rent to return to the full contractual amount and that past due rents will begin to be repaid in the latter half of 2018.

 (Emphasis added).

211.    On this news, the Company's share price closed on October 31, 2017 at $28.66 per share, a $2.11 drop, or approximately 6.8%, from its closing price of $30.97 per share on October 30, 2017, on unusually heavy trading volume.

212.    Also on October 31, 2017, in response to the foregoing disclosures, John Roberts, an analyst at Hilliard Lyons, published a report which stated the following:

On the company's conference call, management obviously spent most of its time discussing concerns around the issues with tenants. Three tenants are currently having issues, with one (Orianna) being of immediate issue, as they are currently not paying rent, one other likely subject to a restructuring (Signature) and a third being a near term issue that management anticipates being cured by the beginning of next year. Management anticipates replacing Orianna with a new tenant(s) over the coming six months with an eventual loss of rental income of around $10 million (about 1% of gross rent). In the meantime, no rent will be received on the properties, although Orianna essentially continues to be running the properties. The company has fully reserved for these non-paid rents. We have worked these expectations into our earnings model and adjusted our estimates accordingly. Management had hoped to work with Orianna to restructure this lease, but came to the conclusion that this was the best course of action for these properties. Management noted that they expect a coverage ratio range of 1.2-1.5 times on the new rental rates once the new leases are in place. This compares with the current ratio of under 1.0 times.

As far as Signature goes, they are about a month behind in rent, although they continue to pay a portion of the contractual rent due ($11 million of the $14.5 million contractual amount). OHI has a letter of credit on this lease that covers all of the past due rent. We anticipate a restructuring of this lease, with OHI forgiving some near term rent but receiving higher rental bumps or some other similar advantages. We have worked this assumption into our model as well. As far as the other tenant goes, we are not assuming any loss here beyond the current year (adjusted) due to this being a liquidity issue, rather than an operating issue. While OHI placed the lease on a cash basis, they expect the coverage ratio on the lease to approach a very solid 1.5 times by the start of 2018, which should allow for the tenant to begin paying the contractual rent at that point. There may be some near term reduction of cash flow paid to the company in Q4, however. We anticipate that this amount will be made up to OHI at a later date.

In discussing the issues regarding Orianna, we questioned management on whether the issues that led to the tenant's nonpayment of rent were specific to that tenant or an industry-wide concern. While there are two other tenants currently having issues, all three of these instances are believed to be tenant-specific events, in a challenging industry environment. Management pointed to the occupancy decline between 2014 and the present from 92% to 89% in the Orianna portfolio as a major catalyst behind Orianna's issues. Orianna generated 2% revenue growth over this period while expenses increased at a 6% pace. OHI management does not believe it is appropriate at this time to adjust their underwriting requirements and believes 1.4x coverage remains conservative. Management also feels that their strength is in investing in regional portfolios and partnering with regional operators, while Orianna had a wide geographic dispersion of properties. Moving forward, they expect to stick with separating portfolios by region amongst their operators in an attempt to avoid situations like this in the future. On the cap rate front, management expects to make acquisitions in the 9% to 9.5% range, which will help to offset lost rent from dispositions.

On the operator front, the overall portfolio improved, although that is more a function of the Orianna portfolio moving out of the group due to the lease going to cash accrual. Portfolio coverage in the most recent trailing twelve months was 1.71 times on a gross cash flow basis compared to the previous number of 1.69 times. That number would be around 1.68 were the Orianna portfolio included, so there was a very slight deterioration. We believe that most of the deterioration was a function of labor costs. Management noted that operating costs were up 6% for Orianna, and that most of these costs are likely labor. We would expect other operators to see pressure on this front as well, although higher coverage ratios should allow them to better absorb these costs.

213.   Therefore, by not revealing Orianna's actual condition in May 2017, Omega was able to cast Omega's "overall portfolio" in a misleadingly positive light.

214.   On November 7, 2017, the Company filed its quarterly report for the third fiscal quarter ended September 30, 2017. The 3Q17 10-Q noted that Omega had restructured two of Orianna's direct financing leases, resulting in impairments totaling $20.8 million, that "Orianna ha[d] not satisfied the contractual payments due under the terms of the remaining two direct financing leases or the separate operating lease with [Omega] and the collectability of future amounts due is uncertain.," and that Omega was "in preliminary discussions with Orianna regarding future actions."

215.   In March 2018, Orianna filed for chapter 11 bankruptcy proceedings. At the time, Omega had entered into a restructuring support agreement with Orianna. However, in July 2018, Omega terminated that agreement citing a desire to protect Company assets and shareholders.[16]

**Discriminatory Misconduct**

216.   The Individual Defendants engaged in and/or permitted the Discriminatory Misconduct. The Individual Defendants allowed multiple violations of Omega's corporate

---

[16] In a statement regarding the termination of the agreements, Defendant Picket stated "The company will be considering and/or pursuing alternative courses of action to protect our assets and shareholder value." https://skillednursingnews.com/2018/07/omega-pulls-plug-restructuring-agreement-struggling-orianna-skilled-nursing-chain/ (last visited November 24, 2020).

governance policies to occur that injured the company. These violations included, but were not limited to, engaging in or allowing the Discriminatory Misconduct and engaging in or allowing widespread violations of the Company's Code of Conduct.

217.    According to the Company's website, the following chart sets forth the Company's directors and Omega's "Committees Membership":



218.    Omega's Board is among the few publicly traded companies in the United States without Black representation on its Board, or amongst the ranks of its executive management either.

219.    The Company's Board assumes accountability for confirming that Omega follows federal and state laws that prohibit racial discrimination. While diversity is a strong indication of a lack of discrimination, a lack of diversity is a compelling signal that the Company does, in fact, discriminate. Here, the Company lack of diversity is staggering. Not one member of the Company's eight-person Board or nine-person executive management team listed on its website is Black. Instead, the overwhelming majority are, in fact, Caucasian.

220.    The following is the Company's management team according to Omega's November 2020 Investor Presentation:



221.    The Individual Defendants have known for a long time that Omega has been violating federal and state laws regarding diversity and discrimination and yet the Individual

Defendants have repeatedly refused to nominate, appoint, or hire a Black individual to the Board or executive team.

### Individual Defendants Have Breached Their Duties by Continually Re-Hiring Ernst & Young LLP as the Company's Auditor Even Though E&Y Has Failed to Perform its Job

222.    Ernst & Young LLP ("E&Y") is the Company's independent auditor, and has been so since at least 1997, which has clearly given rise to a close relationship between Omega and E&Y which is not conducive to effective auditing. Instead, the Company's compliance with its stated policies regarding diversity and inclusion have severely deficient and inadequate. Rather than ensure that the Company's internal controls are effective, E&Y has failed to point out that Omega clearly lacks internal controls to prevent discrimination against Black individuals, at least with respect to the Company's nomination and appointment process for Omega's Board and executive management team, and remain in compliance with its stated endeavors and applicable laws.

223.    As Omega's 2020 Proxy Statement disclosed, the following table sets forth the approximate aggregate fees billed to Omega by E&Y for fiscal years 2018 and 2019:

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | 2019 | 2018 |
| Audit Fees | $ 1,896,000 | $ 1,560,000 |
| Audit-Related Fees | — | — |
| Tax Fees | 1,096,000 | 854,000 |
| All Other Fees | 2,000 | 2,000 |
| Total | $ 2,994,000 | $ 2,416,000 |

224.    Despite billing Omega between $2.4 million and $3 million in fees both 2018 and 2019, E&Y has completely failed to properly audit and assess the Company's internal controls. The Audit Committee Defendants (defined below), are responsible for selecting and monitoring

E&Y and have therefore breach their fiduciary duty by failing to ensure that an adequate audit was being performed of the Company's internal controls regarding diversity and antidiscrimination.

### *Social Justice Corporate Initiatives in 2020*

225.    While the Individual Defendants have caused Omega to adopt discriminatory policies and fail to keep up with the times, the rest of corporate America has been publicly condemning racism as well as implementing social justice initiatives at a rapid pace to combat systemic racism in America and in response to public outrage over the murders of, among many others, George Floyd, Breonna Taylor, and Ahmaud Arbery.[17] For instance: (1) Microsoft, Intel, and Johnson & Johnson have pledged to tie executive pay to certain diversity figures; (2) PepsiCo announced a five-year, $400 million initiative that includes the goal of increasing Black managerial representation by 30% and more than doubling business with Black-owned suppliers; (3) Adidas committed to filing 30% of new positions with Black or Latino workers; and (4) Alexis Ohanian, the co-founder of Reddit, resigned from Reddit's all-Caucasian board, advocated that his seat be filled by a Black individual, and further pledged to use future gains on his Reddit stock to serve the Black community, beginning with Colin Kaepernick's Know Your Rights Camp.

226.    In blatant contrast, Omega has refused to offer any sort of showing of solidarity with the Black Lives Matter movement. Instead the Company has remained noticeably on the sidelines amongst the slew of companies that have pledged to implement changes to increase diversity, particularly Black representation, in corporate America.

227.    In fact, on December 1, 2020, Y*ahoo! Finance* published a news article titled "Nasdaq proposes board diversity requirement for listed companies"[18] reporting that the Nasdaq

---

[17] https://www.forbes.com/sites/davidhessekiel/2020/06/04/companies-taking-a-public-stand-in-the-wake-of-george-floyds-death/?sh=e62ec4172148. (Last visited November 30, 2020).
[18] https://finance.yahoo.com/news/nasdaq-proposes-board-diversity-requirement-

had filed a proposal on that same day with the SEC which would require all Nasdaq-listed companies to adopt new rules related to board diversity or potentially face delisting. The article stated that the new rules will require companies to "have, or publicly explain why they do not have, at least two diverse directors..." The article also stated that, "[t]he exchange operator said that over two dozen studies found an association between diverse boards and better financial performance and corporate governance." The Nasdaq's recent proposal only serves to emphasize the importance of diversity and antidiscrimination and highlight the significance of Omega's lack of diversity on its board resulting from the Discriminatory Misconduct.

### *Lack of Term Limits as Cause for Concern and Method to Discriminate*

228.    According to a report by the Harvard Law School Forum on Corporate Governance longer-tenured directors do not serve the best interests of the Company. The report stated the following, in relevant part:

> Investor respondents to ISS' 2016–2017 Global Policy Survey (conducted between Aug. 2, 2016 and Aug. 30, 2016) were asked which tenure-related factors — with multiple answers allowed — would give rise to concern about a board's nominating and refreshment processes. ***Among the 120 institutional investors (one-third of whom each own or manage assets in excess of $100 billion) who responded, 68 percent pointed to a high proportion of directors with long tenure as cause for concern, 53 percent identified an absence of newly-appointed independent directors in recent years as a potential problem, and 51 percent flagged lengthy average tenure as problematic***. Just 11 percent of the investor respondents said that tenure is not a concern, although even several of those respondents indicated that an absence of newly-appointed directors is a concern.

(Emphasis added.)

> Thus, contrary to the Company's contention within its Corporate Governance Guidelines, losing longstanding directors does not outweigh the benefits of incorporating fresh ideas and viewpoints from individuals with diverse backgrounds on the Board.

---

142022129.html. (Last visited December 1, 2020).

*April 24, 2019 Proxy Statement*

229.    On April 24, 2019, the Company filed the 2019 Proxy Statement with the SEC. Defendants Pickett, Bobins, Callen, Hill, Lowenthal, Perks, Plavin, Anand, and Whitman among others, solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions relating to the Discriminatory Misconduct.[19]

230.    The 2019 Proxy Statement was false and misleading because, despite noting that the Company maintains a "Code of Ethics that applies to all of our directors and employees, including our Chief Executive Officer, Chief Operating Officer, Chief Corporate Development Officer and Chief Financial Officer," the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements relating to the Discriminatory Misconduct as alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

231.    The 2019 Proxy Statement also called for shareholders to: (1) elect eight directors; (2) ratify Ernst & Young LLP as the Company's independent auditor for fiscal year 2019; (3) hold an advisory vote on executive compensation; (4) approve the Employee Stock Purchase Plan which would permit the Company to issue up to 500,000 shares of Company common stock to provide eligible employees of the Company and its eligible subsidiaries with an opportunity to acquire an equity interest in the Company by providing a means to purchase shares of the Company's common stock through payroll deductions. (the "Stock Purchase Plan Proposal").

232.    The 2019 Proxy Statement stated, in relevant part:

---

[19] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

*The Nominating and Corporate Governance Committee endeavors to identify nominees that possess diverse educational backgrounds, business experiences, life skills, as well as diverse gender, racial, sexual orientation, national origin and ethnic characteristics.*

(Emphasis added.)

233.   The statements contained in the 2019 Proxy Statement were materially false and highly misleading since the Board failed to disclose, *inter alia*, that the Individual Defendants, and particularly, the Nominating and Corporate Governance Committee did not have a goal of increasing the racial diversity of applicants for Board seats or the number of racially diverse members of the Board. Instead, the Individual Defendants and the Nominating and Corporate Governance Committee only had the goal of increasing talent and skills among Board candidates. Despite allegedly "endeavoring to identify nominees that possess diverse … racial … characteristics," the truth is that Omega has no Black members on either its Board or its executive management team. Therefore, the unrevealed reality is that Omega may try to incorporate Black candidates in its director nominee pool, but it either has no actual intent to nominate Black candidates to its Board or the Company endeavors to obstruct the nomination of Black candidates in the pool. Either way, it is evident that racial diversity is not among the relevant factors which the Nominating and Corporate Governance Committee considers with respect to determining Board nominees.

234.   Moreover, the 2019 Proxy Statement was also materially false and misleading because it failed to disclose that the Company does not have term limits for its Board members, and that the purpose of the lack of term limits is to cement the current directors in position and inhibit Black individuals from having adequate prospects to be nominated and elected to the Company's Board.

235.   The Individual Defendants' failure to embrace director term limits and to add new members, including Black individuals, to Omega's Board represents explicit or implicit racism at the Company, and an improper cause for failing to include Black individuals as members of the Company's Board.

236.   The 2019 Proxy Statement also failed to disclose that the Company's internal controls were inadequate to protect Black individuals from discrimination in its Board nomination process and Omega's appointment process to the Company's executive management team. Moreover, the 2019 Proxy Statement failed to disclose that the Individual Defendants failed to maintain internal controls to ensure that the Company's stated policies regarding diversity and antidiscrimination were being complied with.

237.   The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company had engaged in the Discriminatory Misconduct; and (2) the Company does not have term limits due to a desire to keep Black individuals off of the Board; (3) the Company's Nominating and Corporate Governance Committee did not actually consider racial diversity when nominating Board candidates, and (4) the Company failed to maintain adequate internal controls.

238.   As a result of the material misstatements and omissions contained in the 2019 Proxy Statement, Company shareholders, *inter alia*, elected eight directors, seven Caucasian and zero Black individuals who were allowing the illegal and discriminatory practices to continue, to the Board and approved the Stock Purchase Plan Proposal.

### *April 28, 2020 Proxy Statement*

239.   On April 28, 2020, the Company filed the 2020 Proxy Statement with the SEC. Defendants Pickett, Bobins, Callen, Hill, Lowenthal, Plavin, Anand, and Whitman among others,

solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions relating to the Discriminatory Misconduct.[20]

240.    The 2020 Proxy Statement was false and misleading because, despite noting that the Company maintains a "Code of Ethics that applies to all of our directors and employees, including our Chief Executive Officer, Chief Operating Officer, Chief Corporate Development Officer, Chief Financial Officer, Chief Legal Officer, General Counsel, and Chief Accounting Officer," the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements relating to the Discriminatory Misconduct as alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

241.    The 2020 Proxy Statement also called for shareholders to: (1) elect seven directors; (2) ratify Ernst & Young LLP as the Company's independent auditor for fiscal year 2020; and (3) hold an advisory vote on executive compensation.

242.    The 2020 Proxy Statement stated, in relevant part:

> *The Nominating and Corporate Governance Committee endeavors to identify nominees that possess diverse educational backgrounds, business experiences, life skills, as well as diverse gender, racial, sexual orientation, national origin and ethnic characteristics.*

(Emphasis added.)

243.    The statements contained in the 2020 Proxy Statement were materially false and highly misleading since the Board failed to disclose, *inter alia*, that the Individual Defendants, and particularly, the Nominating and Corporate Governance Committee did not have a goal of increasing the racial diversity of applicants for Board seats or the number of racially diverse

---

[20] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

members of the Board. Instead, the Individual Defendants and the Nominating and Corporate Governance Committee only had the goal of increasing talent and skills among Board candidates. Despite allegedly "endeavoring to identify nominees that possess diverse … racial … characteristics," the truth is that Omega has no Black members on either its Board or its executive management team. Therefore, the unrevealed reality is that Omega may try to incorporate Black candidates in its director nominee pool, but it either has no actual intent to nominate Black candidates to its Board or the Company endeavors to obstruct the nomination of Black candidates in the pool. Either way, it is evident that racial diversity is not among the relevant factors which the Nominating and Corporate Governance Committee considers with respect to determining Board nominees.

244.    Moreover, the 2020 Proxy Statement was also materially false and misleading because it failed to disclose that the Company does not have term limits for its Board members, and that the purpose of the lack of term limits is to cement the current directors in position and inhibit Black individuals from having adequate prospects to be nominated and elected to the Company's Board.

245.    The Individual Defendants' failure to embrace director term limits and to add new members, including Black individuals, to Omega's Board represents explicit or implicit racism at the Company, and an improper cause for failing to include Black individuals as members of the Company's Board.

246.    The 2020 Proxy Statement also failed to disclose that the Company's internal controls were inadequate to protect Black individuals from discrimination in its Board nomination process and Omega's appointment process to the Company's executive management team. Moreover, the 2020 Proxy Statement failed to disclose that the Individual Defendants failed to

maintain internal controls to ensure that the Company's stated policies regarding diversity and antidiscrimination were being complied with.

247.     The 2020 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company had engaged in the Discriminatory Misconduct; and (2) the Company does not have term limits due to a desire to keep Black individuals off of the Board; (3) the Company's Nominating and Corporate Governance Committee did not actually consider racial diversity when nominating Board candidates, and (4) the Company failed to maintain adequate internal controls.

248.     As a result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders, *inter alia*, elected seven directors, seven Caucasian and zero Black individuals, to the Board.

## DAMAGES TO OMEGA

249.     As a direct and proximate result of the Individual Defendants' conduct, Omega has lost and will continue to lose and expend many millions of dollars.

250.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action,  filed against the Company, its CEO, its CFO, and its COO, which has already survived a motion to dismiss, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

251.     Such expenditures include, but are not limited to costs associated with the costs of defending potential investigations of the Discriminatory Misconduct and for fines paid in connection thereto.

252.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

253.    As a direct and proximate result of the Individual Defendants' conduct, Omega has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

254.    Plaintiff brings this action derivatively and for the benefit of Omega to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Omega, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a) of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

255.    Omega is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

256.    Plaintiff is, and has been at all relevant times, a shareholder of Omega. Plaintiff will adequately and fairly represent the interests of Omega in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

257.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

258.    A pre-suit demand on the Board of Omega is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants

Pickett, Callen, Hill, Lowenthal, and Plavin (the "Longstanding Directors"), along with Defendants Anand and Whitman (together with the Longstanding Directors, the "Director-Defendants"), and non-party Kevin J. Jacobs (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

259.    Demand is excused as to all of the Longstanding Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts relating to, *inter alia*, Orianna's financial condition and the Working Capital Loan, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

260.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts relating to, *inter alia*, the Discriminatory Misconduct, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

261.    Demand is also excused as to all of the Director-Defendants because the Discriminatory Misconduct was an unlawful business strategy that the Company engaged in and was not a valid exercise of business judgment, as it was based on bad faith and intentional, reckless, or disloyal misconduct. As the ultimate decision-making body of the Company, the Board made and/or allowed the Company to engage in the schemes outlined herein.

262.     In complete abdication of their fiduciary duties, the Longstanding Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Longstanding Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

263.     Demand is also excused as to the Director-Defendants because they were fully aware of the Discriminatory Misconduct throughout the Relevant Period. Nonetheless, the Director-Defendants caused the Company to disseminate the false and misleading statements described herein. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

264.     Additional reasons that demand on Defendant Pickett is futile follow. Defendant Pickett has served as the Company's CEO since June 2001 and has served as a Company director since May 2002. Defendant Pickett also serves as a member of the Company's Investment Committee. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Pickett with his principal occupation, and he has received and continues to receive handsome compensation, including $7,287,348 during fiscal 2019. Defendant Pickett was ultimately responsible for the false and misleading statements and omissions that were made, including those contained in the 2016 10-K, 1Q17 10-Q, and 2Q17 10-Q, all of which he signed. As an officer and director, he conducted little, if any, oversight of the Discriminatory Misconduct (which Defendant Pickett engaged in and permitted despite being aware of it), the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously

disregarded his duties to protect corporate assets. Moreover, Defendant Pickett is a defendant in the Securities Class Action. Thus, for these reasons, Defendant Pickett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

265.    Additional reasons that demand on Defendant Callen is futile follow. Defendant Callen has served as a Company director since April 2013 and has served as Chairman of the Board since June 8, 2017. He also serves as the Chair of the Investment Committee, as a member of the Audit Committee, and as a member of the Nominating and Governance Committee. He has received and continues to receive handsome compensation for his role as a director as described herein, including $360,229 during fiscal 2019. As a trusted Company director and Chairman of the Board, he conducted little, if any, oversight of the Discriminatory Misconduct (which Defendant Callen engaged in and permitted despite being aware of it), the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Callen signed, and thus personally made the false and misleading statements in the 2016 10-K. Thus, for these reasons, Defendant Callen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

266.    Additional reasons that demand on Defendant Hill is futile follow. Defendant Hill has served as a Company director since April 2013. She also serves as a member of the Compensation Committee. Defendant Hill has received and continues to receive handsome compensation for her role as a director as described herein, including $207,477 during fiscal 2019. As a trusted Company director, she conducted little, if any, oversight of the Discriminatory

Misconduct (which Defendant Hill engaged in and permitted despite being aware of it), the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Hill signed, and thus personally made the false and misleading statements in the 2016 10-K. Thus, for these reasons, Defendant Hill breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

267.   Additional reasons that demand on Defendant Lowenthal is futile follow. Defendant Lowenthal has served as a Company director since 1995. He serves as the Chairman of the Compensation Committee and as a member of the Nominating and Governance Committee. Previously, he served as a member of the Audit Committee. Defendant Lowenthal has received and continues to receive handsome compensation for his role as a director as described herein, including $236,001 during fiscal 2019. As a trusted Company director and member of the Audit Committee, he conducted little, if any, oversight of the Discriminatory Misconduct (which Defendant Lowenthal engaged in and permitted despite being aware of it), the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Lowenthal signed, and thus personally made the false and misleading statements in the 2016 10-K. For these reasons, too, Defendant Lowenthal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

268.   Additional reasons that demand on Defendant Plavin is futile follow. Defendant Plavin has served as a Company director since 2000. He also serves as the Chairman of the

Nominating and Governance Committee and as a member of the Compensation Committee. Previously, he served as a member of the Audit Committee. He has received and continues to receive handsome compensation for his role as a director as described herein, including $227,003 during fiscal 2019. As a trusted Company director and member of the Audit Committee, he conducted little, if any, oversight of the Discriminatory Misconduct (which Defendant Plavin engaged in and permitted despite being aware of it), the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Plavin signed, and thus personally made the false and misleading statements in the 2016 10-K. For these reasons, Defendant Plavin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

269.     Additional reasons that demand on Defendant Anand is futile follow. Defendant Anand has served as a Company director since 2018. She also serves as the Chairman of the Audit Committee. She has received and continues to receive handsome compensation for her role as a director as described herein, including $227,503 during fiscal 2019. As a trusted Company director and Chairman of the Audit Committee, she conducted little, if any, oversight of the Discriminatory Misconduct (which Defendant Anand engaged in and permitted despite being aware of it), the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Anand breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

270.     Additional reasons that demand on Defendant Whitman is futile follow. Defendant Whitman has served as a Company director since 2018. He also serves as a member of the Audit Committee. He has received and continues to receive handsome compensation for his role as a director as described herein, including $192,961 during fiscal 2019. As a trusted Company director and member of the Audit Committee, he conducted little, if any, oversight of the Discriminatory Misconduct (which Defendant Whitman engaged in and permitted despite being aware of it), the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Whitman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

271.     Additional reasons that demand on the Board is futile follow.

272.     Defendants Callen, Lowenthal, Plavin, Anand, and Whitman (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting processes and internal controls, the integrity of the Company's financial statements, the Company's compliance with applicable laws, and the Company's risk assessment and risk management policies relating to financial and accounting matters. The Audit Committee Defendants were also responsible for reviewing and discussing with management the Company's disclosures in its periodic reports with the SEC and earnings press releases. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes and internal controls, as they are charged to do under the Audit Committee Charter,

allowing the Company to issue false and misleading statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

273.    Defendants Callen, Lowenthal, Plavin (the "Nominating and Corporate Governance Committee Defendants") served as members of the Nominating and Corporate Governance Committee during the Relevant Period. Pursuant to the Company's Nominating and Corporate Governance Committee Charter, the Nominating and Corporate Governance Committee Defendants are responsible for, among other things, identifying individuals qualified to become members of the Board, selecting the director nominees, develop a set of corporate governance principles for the Company. The Nominating and Corporate Governance Committee Defendants engaged or permitted the Company to engage in the Discriminatory Misconduct. Thus, the Nominating and Corporate Governance Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

274.    As detailed in the Company's 2017 Proxy Statement, the Board "regularly review[ed] the performance, credit information and coverage ratios of [its] operators." Thus, the Longstanding Directors knew of or should have known of the deteriorating financial condition, diminished liquidity of the Company's operators, including Orianna, and the impact the foregoing would have on their ability to make timely rent payments, prior to their public disclosure of this information and, consequently, knew or should have known of the falsity of the misleading statements and omissions at the time they were made. As detailed herein, as of December 31, 2016, Orianna operated in 59 facilities across the country and was Omega's second largest operator. At that time, Omega had invested over $619 million in Orianna facilities, which represented nearly 7% of the Company's investment portfolio. In 2016, Defendant Booth explained that "[o]ne private

top 10 operator,[21] of note, however, felt the performance pressure more than most" and that "[i]n an effort to assist the company during this transitional period, Omega embarked on an effort to sell off the company's northwest region, which consisted of 7 facilities" and that "[t]his region has struggled of late and given its geographical remoteness, has been difficult to oversee." Moreover, the Company provided Orianna with a working capital loan in the amount of $18.8 million which represented approximately half of the cash available to Omega at that time. Given the Board's stated public policy regarding its review of the financial information of its operators, Defendant Booth's 2016 statement, the size and importance of Orianna to Omega, and the magnitude and purpose of the working capital loan provided by Omega to Orianna, the Longstanding Directors each knew of the falsity of the statements and misleading omissions detailed herein at the time such statements were made, and further failed to exercise or recklessly disregarded their duty of oversight to stop or correct such misleading statements and omissions.

275.    In violation of the Code of Conduct, the Longstanding Directors conducted little, if any, oversight of the Company's engagement in certain of the Individual Defendants' scheme to issue materially false and misleading statements relating to, *inter alia*, Orianna's financial condition and the Working Capital Loan to the public and to facilitate and disguise certain of the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and for contribution under Sections 10(b) and 21D of the Exchange Act. In further violation of the Code of Conduct, the Longstanding Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the

---

[21] Defendant Booth was making reference to Orianna.

Code of Conduct. Thus, the Longstanding Directors face a substantial likelihood of liability and demand is futile as to them.

276.    In violation of the Code of Conduct, the Nominating and Corporate Governance Committee Charter, the Human Capital Support & Development policy, and the Human Rights Policy, the Director-Directors conducted little, if any, oversight of the Company's engagement in certain of the Individual Defendants' scheme to issue materially false and misleading statements relating to, *inter alia*, the Discriminatory Misconduct to the public and to facilitate and disguise certain of the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations the Exchange Act. In further violation of the Code of Conduct, the Director-Directors failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

277.    Omega has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Omega any part of the damages Omega suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

278.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability,

they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

279.    The acts complained of herein constitute violations of fiduciary duties owed by Omega's officers and directors, and these acts are incapable of ratification.

280.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Omega. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Omega, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

281.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Omega to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

282.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Defendants Pickett, Bobins, Callen, Hill, Lowenthal, Perks, Plavin, Anand, and Whitman for Violations of Section 14(a) of the Securities Exchange Act of 1934

283.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

284.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

285.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

286.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

287.    Under the direction and watch of the Individual Defendants, the 2019 Proxy Statement and the 2020 Proxy Statement (the "Proxy Statements") failed to disclose that: (1) the Company had engaged in the Discriminatory Misconduct; and (2) the Company does not have term limits due to a desire to keep Black individuals off of the Board; (3) the Company's Nominating and Corporate Governance Committee did not actually consider racial diversity when nominating Board candidates, and (4) the Company failed to maintain adequate internal controls.

288.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose the Discriminatory Misconduct and that the Company's share price was being artificially inflated by the false and misleading statements related to, *inter alia*, Orianna's financial condition and the Working Capital Loan made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

289.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's Code of Conduct, due to the Individual Defendants' failure to abide by the Code of Conduct, due to the Individual Defendants' failures to abide by them and their engagement in or the tolerance of the Discriminatory Misconduct and the scheme to issue false and misleading statements and omissions of material fact relating to the Discriminatory Misconduct.

290.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained

in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, election of directors, the ratification of the selection of E&Y, and the approval of the Stock Purchase Plan Proposal.

291.    The false and misleading elements of the Proxy Statements led to, *inter alia*, the approval of the Stock Purchase Plan Proposal and the re-election of Defendants Pickett, Callen, Hills, Lowenthal, and Plavin which allowed them to continue breaching his fiduciary duties to Omega.

292.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

293.    Plaintiff on behalf of Omega has no adequate remedy at law.

## SECOND CLAIM

**Against Defendants Pickett, Stephenson, Booth, Bernfield, Bobins, Callen, Hill, Kloosterman, Korman, Lowenthal, Perks, and Plavin, for Breach of Fiduciary Duties**

294.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

295.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Omega's business and affairs.

296.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

297.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Omega.

298.   In breach of their fiduciary duties owed to Omega, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose: (1) the deteriorating financial and operating results of certain of Omega's operators, including Orianna; (2) the resulting diminished liquidity of those operators, including Orianna, and its impact on their ability to make timely rent payments; (3) that as a result, certain of Omega's direct financing leases were impaired and certain receivables were uncollectible; (4) the Individual Defendants caused Omega to become directly involved in Orianna's attempt to stabilize its financial condition and, as a result, Omega provided the Working Capital Loan to Orianna; (5) thereafter, whatever rent payments Orianna made to Omega was a direct result from the monies Orianna received from the Working Capital Loan that Omega provided to Orianna; and (6) that Omega failed to maintain internal controls; and (7) that due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and/or lacked a reasonable basis in fact.

299.   The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

300.   Additionally, while the Individual Defendants caused the Company's stock to be artificially inflated, two of the Individual Defendants benefitted themselves by engaging in lucrative insider sales on material inside information.

301.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

302.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements related to, *inter alia*, Orianna's financial condition and the Working Capital Loan, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Omega's securities, and disguising insider transactions.

303.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Omega's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

304.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

305.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Omega has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

306.     Plaintiff on behalf of Omega has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties
### Related to the Discriminatory Misconduct

307.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

308.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Omega's business and affairs.

309.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

310.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Omega.

311.     In further breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in the Discriminatory Misconduct.

312.     In breach of their fiduciary duties owed to Omega, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose the Discriminatory Misconduct.

313.     The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

314.     Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

315.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements relating to the Discriminatory Misconduct, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Omega's securities, and disguising insider transactions.

316.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of engaging in and concealing the Discriminatory Misconduct and thereby artificially inflating the price of Omega's securities. The Individual

112

Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

317.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

318.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Omega has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

319.     Plaintiff on behalf of Omega has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Unjust Enrichment

320.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

321.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Omega.

322.     The Individual Defendants either benefitted financially from the receipt of funds received through the redemption of preferred stock or based on improper conduct received bonuses, stock options, or similar compensation from Omega that was tied to the performance or artificially inflated valuation of Omega, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

323.     Plaintiff, as a shareholder and a representative of Omega, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including

any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

324.    Plaintiff on behalf of Omega has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Abuse of Control

325.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

326.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Omega, for which they are legally responsible.

327.    As a direct and proximate result of the Individual Defendants' abuse of control, Omega has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Omega has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

328.    Plaintiff on behalf of Omega has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Gross Mismanagement

329.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

330.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Omega in a manner consistent with the operations of a publicly-held corporation.

331.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Omega has sustained and will continue to sustain significant damages.

332.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

333.    Plaintiff on behalf of Omega has no adequate remedy at law.

### SEVENTH CLAIM

**Against Individual Defendants for Waste of Corporate Assets**

334.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

335.    The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Omega to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

336.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

337.    Plaintiff on behalf of Omega has no adequate remedy at law.

## EIGHTH CLAIM

**Against Defendants Pickett, Stephenson, and Booth for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

338.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

339.    Omega, along with Defendants Pickett, Stephenson, and Booth are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Pickett, Stephenson, and Booth's willful and/or reckless violations of their obligations as officers and/or directors of Omega.

340.    Defendants Pickett, Stephenson, and Booth, because of their positions of control and authority as officers and/or directors of Omega, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Omega, including the wrongful acts complained of herein and in the Securities Class Action.

341.    Accordingly, Defendants Pickett, Stephenson, and Booth are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

342.    As such, Omega is entitled to receive all appropriate contribution or indemnification from Defendants Pickett, Stephenson, and Booth.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Omega, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Omega;

(c)     Determining and awarding to Omega the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Omega, the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Omega and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Omega to nominate at least four candidates for election to the Board, which should include at least two Black individuals;

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

4.  a proposal to ensure the publication of an annual Diversity Report that contains particularized information about the hiring, advancement, promotion, and pay equity of all minorities at Omega;

5.  a proposal to establish a fund to hire Black individuals and other minorities, promote Black individuals and other minorities to more management positions at the Company, establish and maintain a mentorship program at Omega for Black individuals and other minorities that is committed to providing the skills and mentorship necessary to succeed at the Company;

6.  a proposal to establish and require annual training of Omega's entire Board and all executive officers, which training should at a minimum focus on diversity, antidiscrimination, and affirmative action, as well as other relevant topics;

7.  a proposal to adopt a revised executive compensation program that ties 30% of executives' compensation to the achievement of certain specified diversity goals; and

8.  a proposal to replace E&Y as its independent auditor.

(e)     Awarding Omega restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses in an amount to be determined at trial; and

       (g)     Granting such other and further relief as the Court may deem just and proper.

Dated: December 1, 2020

Of Counsel:                                Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**         **MURPHY, FALCON & MURPHY**

Timothy Brown                         By: _____
240 Townsend Square               Nikoletta S. Mendrinos (Bar No. 18961)
Oyster Bay, NY 11771              One South Street, 30th Floor
Telephone: (516) 922-5427        Baltimore, Maryland 21202
Facsimile: (516) 344-6204         Telephone: (410) 539-6500
Email: tbrown@thebrownlawfirm.net  Facsimile: (410) 539-6599
                                   Email: nikoletta.mendrinos@murphyfalcon.com
                                   *Attorneys for Plaintiff*

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

By: _____
Nikoletta S. Mendrinos (Bar No. 18961)