IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ROBERT WOJCIK, derivatively on behalf *
of OMEGA HEALTHCARE
INVESTORS, INC.,                       *

    Plaintiff,                       *

    v.                               *   CIVIL NO. JKB-20-3491

OMEGA HEALTHCARE INVESTORS,            *
INC., et al.,
                                       *
    Defendants.
                                       *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM

Pending before the Court are Plaintiff Robert Wojcik's Motion for Final Approval of Settlement (ECF No. 85) and Motion for Final Approval of Attorneys' Fees, Expenses, and Service Award for Plaintiff (ECF No. 86). For the reasons that follow and for the reasons explained in open court during the August 6, 2024 Hearing, the Motions are granted as detailed below.

### I. Background

Plaintiff filed his Complaint derivatively on behalf of Omega Health Investors, Inc. ("Omega" or "the Company") against Omega and various individual officers and directors of Omega. (*See generally* ECF No. 1.) Omega "is a real estate investment trust which invests in healthcare facilities, such as skilled nursing and senior care facilities" and it "either owns the properties and leases them to facility operators, or it provides operators with mortgage financing." (*Id.* ¶ 2.)

Plaintiff brought two categories of claims against Omega and the individual defendants, which Plaintiff refers to as the Non-Diversity Claims and the Diversity Claims. (*See generally id.*)

The Non-Diversity Claims relate to allegedly false or misleading statements Omega made regarding certain facility operators and Omega's financial condition. (*See id.* ¶¶ 119–215.) The Diversity Claims relate to alleged discriminatory practices. (*See id.* ¶¶ 216–48.) At issue now are the Diversity Claims, as Plaintiff agreed to dismiss the Non-Diversity Claims with prejudice as to himself only.[1]

In short, the Diversity Claims involve Omega's failure to nominate, appoint, and/or hire Black individuals to the Board or to Omega's executive management team (the "Discriminatory Misconduct") and Omega's alleged misrepresentations in its proxy statements relating to Board diversity. (ECF No. 1 ¶ 27.) Plaintiff alleged that the individual Defendants breached their fiduciary duties by "permit[ting] the Discriminatory Misconduct, engag[ing] in and caus[ing] the Company to engage in the Discriminatory Misconduct, and fail[ing] to maintain adequate controls." (*Id.* ¶ 29.) Plaintiff also alleged that the individual Defendants "deceived investors by claiming to abide by certain antidiscrimination policies" and therefore "breached their duty of candor and [] violated the federal securities laws." (*Id.* ¶ 30.) Plaintiff further alleged that the individual Defendants "caused the Company to violate Section 14(a) of the Exchange Act" because

---

[1] As Plaintiff explains:

> In making his Non-Diversity Claims, Plaintiff also alleges that, between February 8, 2017 and October 31, 2017, the Individual Defendants made and/or caused Omega to make false and misleading statements and omissions of material fact about, inter alia, the financial and operating results and liquidity of the Company's operators and the resulting impairment of the Company's direct finance leases. The same or substantially similar statements were also alleged to be false and misleading: (1) in a consolidated securities fraud class action captioned *In re: Omega Healthcare Investors, Inc. Securities Litigation*, Case No. 1:17-cv-08983 (S.D.N.Y.) (the "Securities Class Action"); (2) in a shareholder derivative suit brought on behalf of Omega captioned *Stourbridge Investments, LLC v. Callen et al.*, Case No. 1:18-cv-07638 (S.D.N.Y.) (the "*Stourbridge* Action"); and (3) in a consolidated shareholder derivative suit brought on behalf of Omega captioned *Swan v. Pickett et al.*, Case No. 24-C-19-000972 (Balt. Cit. Cir. Ct. Md.) (the "*Swan* Action," and together with the *Stourbridge* Action, the "Other Derivative Actions").

(ECF No. 85-1 at 11 n.5.) Plaintiff states that these other actions have been resolved through separate settlements. (*Id.* at 7 n.2.)

Omega's proxy statements were false and misleading because, *inter alia*, they failed to disclose that: (1) Omega had engaged in discriminatory practices; (2) Omega did not have term limits due to a desire to keep Black individuals off of the Board; (3) Omega's Nominating and Corporate Governance Committee did not actually consider racial diversity when nominating Board candidates; and (4) Omega failed to maintain adequate internal controls. (*Id.* ¶ 32.) As relief, Plaintiff sought damages and various corporate governance reforms. (*Id.* at 117–18.)

Plaintiff filed his Complaint in December 2020, and the parties thereafter agreed to stay the case pending the outcome of related litigation (ECF Nos. 36, 37). The parties provided periodic status reports. (*See* ECF Nos. 46, 51, 57, 59, 61, 64, 66, 68, 70, 72, 74.)

The parties to this matter and to the other related matters described above engaged the services of a mediator in December 2020. (ECF No. 77-4 at 3.) On December 31, 2020, the parties exchanged mediation briefs, and Plaintiff's settlement demand included a corporate governance reform proposal and damage analysis. (*Id.* at 4.) In January 2021, the parties to this matter and to the other related matters participated in an all-day mediation session with the mediator, and thereafter conducted negotiations over the next 19 months. (*Id.*) In September 2022, the parties to this matter and to the other related matters participated in another all-day mediation session, which resulted in the resolution of the Securities Class Action, but not of this matter or the Other Derivative Actions. (*Id.*)

The parties continued their discussions, and ultimately agreed in September 2023 on the material terms of a settlement. (*Id.*) Pursuant to the proposed settlement agreement with respect to this matter, Omega's Board of Directors agreed to adopt and to maintain for at least two years a series of corporate governance reforms:

> (a) the appointment of a new independent and diverse director to the Board; (b) the creation of an Environmental, Social, and Governance ("ESG") Steering

3

Committee and Charter to, *inter alia*, advance Omega's governance, sustainability, and diversity and inclusion programs, and shape and support the Company's commitment to environmental sustainability, corporate responsibility, operational transparency, and social responsibility; (c) the establishment of a new process for nominating directors to the Board pursuant to which Omega, among other things, shall endeavor to develop a pool of candidates that includes at least two members of underrepresented groups; (d) the establishment of a new process for hiring senior leadership positions, which is designed to develop a pool of potential candidates that includes at least two members of underrepresented groups; (e) the creation of a new diversity training program that provides periodic diversity and inclusion training for all Company employees and officers; and (f) the creation of a new process for reporting to public shareholders on Board skills and diversity by providing a Board skills and diversity matrix in Omega's annual proxy statements (together, the "Corporate Governance Reforms").

(ECF No. 85-1 at 8.)

Many of the above-described reforms are already in place, and have been in place for at least two or three years. With respect to the appointment of a diverse director to the Board, Omega "appointed a new African-American, female, and independent director . . . to the Board in 2021." (ECF No. 77-4 at 29.) The above-described ESG Steering Committee was created in 2021. (*Id.*) Omega began providing the above-described Diversity and Inclusion training in 2021. (*Id.* at 30.) Further, Omega implemented the practice of providing a Board skills and diversity matrix in its annual Proxy statements in April 2022. (*Id.*) However, the parties note that "Omega acknowledges and agrees that the filing, pendency, and settlement of the Derivative Action was a material factor in its decision to adopt, implement, and maintain the Corporate Governance Reforms." (ECF No. 85-1 at 8–9.)

In November 2023, the parties participated in a third all-day mediation session to negotiate attorneys' fees and expenses. (ECF No. 77-4 at 5.) Although no agreement was reached at this session, the parties ultimately accepted the mediator's double-blind proposal with respect to attorneys' fees and expenses in November 2023. (*Id.*) Under this proposal, Omega's insurers will pay $850,000 in attorneys' fees and expenses to Plaintiff's counsel. (*Id.*)

4

In February of this year, the Plaintiff filed a motion to preliminary approve the settlement (ECF No. 77), which the Court granted (ECF No. 80). Plaintiff thereafter filed the instant pending Motions. (ECF Nos. 85, 86.)

## II. Analysis

### A. Motion for Final Approval of Settlement

Federal Rule of Civil Procedure 23.1(c) provides that "[a] derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval." The Court concludes, for the reasons discussed below and at the Hearing, that the settlement should be approved.

#### 1. Notice

Rule 23.1(c) provides that "[n]otice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders." The parties previously proposed that Omega would: (a) post the Notice (which was attached to the Plaintiff's briefing, ECF No. 77-4 at 41–50), with a copy of the Stipulation (*id.* at 2–28) and exhibits thereto, on the investor relations page of the Company's website; (b) publish the Summary Notice (*id.* at 51–54) in Investor's Business Daily or issue the Summary Notice in a press release with GlobalNewswire, including a link to the investor relations page of the Company's website; and (c) file the Notice, with a copy of the Stipulation and exhibits thereto, as exhibits to an SEC Form 8-K. (ECF No. 77-2 at 26–28.) The Court previously concluded that the proposed notice "constitute[d] the best notice practicable under the circumstances, constitute[d] due and sufficient notice of all matters relating to the Settlement, and me[t] the requirements of Rule 23.1 and due process[.]" (ECF No. 80 ¶ 5.) Omega provided notice in the manner approved by the Court. (*See* ECF No. 81.) The Court therefore finds that the notice provided complies with Rule 23.1.

## 2.  Fair, Reasonable, and Adequate

In determining whether a settlement should be approved, the Court considers whether it is fair, reasonable, and adequate. *Erny on behalf of India Globalization Cap., Inc. v. MuKunda*, Civ. No. DKC 18-3698, 2020 WL 3639978, at *2 (D. Md. July 6, 2020); *see also* 7C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1839 (3d ed. 2024) ("The generally accepted standard is that the agreement must be fair and adequate in light of the interests of all the parties[.]"). The Court is mindful that "[s]ettlements of shareholder derivative actions are particularly favored because such litigation is notoriously difficult and unpredictable." *Zimmerman v. Bell*, 800 F.2d 386, 392 (4th Cir. 1986) (also explaining that "[s]ettlement here is favored for the reasons that settlements generally are favored: disputes are resolved; the resources of litigants and courts are saved; and, in the case of a derivative action, management can return its attention and energy from the courtroom to the corporation itself").

With respect to a settlement's fairness, courts consider: "(1) the posture of the case at the time settlement was proposed; (2) the extent of discovery that had been conducted; (3) the circumstances surrounding the negotiations; and (4) the experience of counsel in the area of [the] class action litigation." *In re: Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 952 F.3d 471, 484 (4th Cir. 2020) (citing *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 150 (4th Cir. 1991)). "The fairness analysis is intended primarily to ensure that a 'settlement [is] reached as a result of good-faith bargaining at arm's length, without collusion.'" *Berry v. Schulman*, 807 F.3d 600, 614 (4th Cir. 2015) (quoting *Jiffy Lube*, 927 F.2d at 159).

Here, as Plaintiff acknowledges, the case was settled at an early stage of litigation. Indeed, the case was stayed approximately 20 days after it was filed, and has remained stayed since then.

Therefore, the first factor—the posture of the case—does not necessarily weigh in favor of approval. However, this is offset by the other factors, as discussed below. Further, there are no objections to the settlement, "which other courts have found may well evidence the fairness of the Settlement." *See Erny*, 2020 WL 3639978, at *3 (citation and quotation omitted).

With respect to the extent of discovery, although no formal discovery was conducted, the record reflects that Plaintiff's counsel conducted extensive investigation and reviewed documents provided by Defendants pursuant to a protective order. (*See* ECF No. 85-1 at 19.) The parties also exchanged mediation briefs in connection with their settlement discussions. (*Id.* at 12–13.)

The circumstances surrounding the negotiations also weigh in favor of settlement approval. The parties engaged a neutral, third-party mediator and engaged in formal mediation and other discussions on a number of occasions. (ECF No. 77-4 at 3–5 (explaining that the Parties "engaged the services of neutral mediator David Murphy, Esq. of Phillips ADR" and participated in various settlement conferences and other discussions); *see Erny*, 2020 WL 3639978, at *2 ("[T]he aid of extensive formal mediation is a hallmark of a non-collusive, arm's-length settlement process" (quotations and alterations omitted).) In short, nothing in the circumstances surrounding the negotiations suggests that the settlement was a product of anything other than good-faith, arm's-length bargaining. Finally, the experience of counsel also weighs in favor of finding that the proposed settlement is fair. (*See* ECF No. 85-3 ¶¶ 48–49; ECF No. 85-4.)

In assessing the adequacy of a proposed settlement, the Court must consider: "(1) the relative strength of the plaintiffs' case on the merits; (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial; (3) the anticipated duration and expense of additional litigation; (4) the solvency of the defendant[] and the likelihood of recovery on a litigated judgment; and (5) the degree of opposition to the settlement." *Lumber*

*Liquidators*, 952 F.3d at 484 (citing *Jiffy Lube*, 927 F.2d at 159). "The most important factors in this analysis are the relative strength of the plaintiffs' claims on the merits and the existence of any difficulties of proof or strong defenses." *Sharp Farms v. Speaks*, 917 F.3d 276, 299 (4th Cir. 2019). The Fourth Circuit has not enumerated factors for assessing reasonableness. *1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 527 (4th Cir. 2022). However, it has "suggested that assessing whether a class settlement is 'reasonable' involves examining the amount of the settlement." *Id.* (citing *Sharp Farms*, 917 F.3d at 303–04).

The Court finds that the strength of Plaintiff's case on the merits and the existence of difficulties of proof weigh heavily in favor of approval. Plaintiff's theories are relatively novel, and it is not clear whether Plaintiff's claims could survive a motion to dismiss, let alone the later stages of litigation. *See In re Fab Universal Corp. Shareholder Derivative Litig.*, 148 F. Supp. 3d 277, 281–82 (S.D.N.Y. 2015) ("The doctrine of demand futility, the business judgment rule, and the generally uncertain prospect of establishing a breach of fiduciary duties combine to make shareholder derivative suits an infamously uphill battle for plaintiffs."). Moreover, "[t]his case has not undergone substantive motion practice, and it is therefore even less clear that Plaintiff[] will be meritorious in establishing liability than in other instances where settlement is reached after extensive adversarial proceedings." *Id.* Further, the anticipated duration and expense of additional litigation also weighs in favor of settlement approval. This case is in its infancy, and a resolution could be years away should the case proceed. By contrast, the proposed settlement provides for immediate corporate reforms. The Court does not find that Omega's solvency is at issue for purposes of approval. Moreover, there is no opposition to the proposed settlement, further bolstering the Court's conclusion that the proposed settlement should be approved.

The Court recognizes that the proposed settlement here does not provide for any pecuniary

8

benefit to the Company, but also recognizes that "in derivative actions where the harm done is to the corporation, a monetary benefit is not necessary for settlement approval." *Fab Universal*, 148 F. Supp. 3d at 280 (citing *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 395 (1970)). Here, the benefits achieved are various corporate governance reforms that go straight to the heart of Plaintiff's Diversity Claims. Plaintiff raised claims regarding Omega's alleged lack of diversity and related discriminatory misconduct, and the corporate reforms provided in the proposed settlement aim to address those very issues. This also weighs in favor of approval. *See id.* ("Such reforms that directly address the issues that gave rise to suit are exactly the type that courts deem to confer a substantial benefit on the company.").

Further, the Court finds that it is appropriate for Plaintiff to voluntarily dismiss the Non-Diversity Claims, given that he is dismissing them with prejudice as to himself only, and given that these claims are addressed in the other related matters.

### B. Motion for Final Approval of Attorneys' Fees, Expenses, and Service Award

Plaintiff's counsel seeks an award of $850,000 in attorneys' fees and expenses, and a $2,000 service award for Plaintiff. (*See generally* ECF No. 86.) As Plaintiff explained, the parties ultimately agreed in September 2023 on the material terms of a settlement after multiple rounds of formal and informal negotiations. (ECF No. 77-4 at 4.) Thereafter, in November 2023, the parties participated in a third all-day mediation session to negotiate attorneys' fees and expenses. (*Id.* at 5.) Although no agreement was reached at this session, the parties ultimately accepted the mediator's double-blind proposal with respect to attorneys' fees and expenses in November 2023. (*Id.*) Under this proposal, Omega's insurers agreed to pay $850,000 in attorneys' fees and expenses to Plaintiff's counsel. (*Id.*) For the reasons discussed below, the Court will grant Plaintiff's Motion.

### 1. Method for Calculating Fees

The Court first addresses the appropriate method for assessing attorneys' fees. "When resolving fee disputes within the context of shareholder derivative litigation courts utilize a variety of methods for calculating a reasonable fee award." *In re Star Sci., Inc.*, Civ. No. 13-0550-AJT/JFA, 2016 WL 4820637, at *4 (E.D. Va. Aug. 3, 2016). Further, in making its assessment regarding the appropriate amount of fees, the Court must ensure that counsel is adequately compensated such that appropriate, and not unmeritorious, shareholder litigation is undertaken.

Plaintiff's counsel explains that they are entitled to the requested award of attorneys' fees and expenses pursuant to the "percentage of recovery" method or, alternatively, pursuant to the factors laid out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). (ECF No. 86-1 at 20–32.) The Court concludes that the appropriate method for assessing fees is pursuant to the *Johnson* factors, and not the percentage of recovery method. "[T]he United States Court of Appeals for the Fourth Circuit . . . favors analysis of the *Johnson* Factors." *Erny*, 2020 WL 3639978, at *4. The use of the *Johnson* factors is particularly appropriate "in cases similar to this one, where there is no monetary benefit in a settlement agreement, but rather only corporate governance reforms." *Id.*[2] Accordingly, the Court will next examine the requested fee amount pursuant to the *Johnson* factors.

---

[2] Plaintiff argues that the percentage of recovery method is appropriate, given that "[h]ere, there practically is a calculable monetary benefit arising from the Settlement which, in essence, created a common fund worth at least several times more than $1,000,000." (ECF No. 86-1 at 20.) Valuing the corporate reforms here at "several times more than $1,000,000" is pure speculation. Plaintiff cites certain other shareholder derivative actions in which courts have found that $1,000,000 or more in attorneys' fees was appropriate where a settlement achieved the appointment of an independent director. (*See id.*) However, the circumstances surrounding each derivative action and each settlement are unique, and nothing in the record of this case assures the Court that assigning any specific dollar amount to the corporate reforms is appropriate.

For instance, Plaintiff provides the transcript from a hearing in another case in which the judge explains that "it seems to me that about a million dollars was a proper plaintiff firm recovery for achieving the independent director alone" (ECF No. 86-7 at 43) but also notes on multiple occasions that the method for determining attorneys' fees has "a certain amount of arbitrariness to it." (ECF No. 86-7 at 42; *see also id.* at 44 ("Is that a perfect calculation? It

Under the Fourth Circuit's approach:

> The proper calculation of an attorney's fee award involves a three-step process. First, the court must determine the lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate. To ascertain what is reasonable in terms of hours expended and the rate charged, the court is bound to apply the factors set forth in [*Johnson*]. Next, the court must subtract fees for hours spent on unsuccessful claims unrelated to successful ones. Finally, the court should award some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff.

*McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013), *as amended* (Jan. 23, 2014) (citations and quotation marks omitted). The *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions presented by the case; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorneys due to acceptance of the case; (5) the customary fee for like work; (6) whether the fee is fixed or contingent; (7) any time limitations imposed by the client or the circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) attorneys' fees awards in similar cases. *Id.*

While the Court will use the above process for assessing the attorneys' fees, the Court agrees with Plaintiff's position that the Court should accord deference to the attorneys' fees negotiated by the parties. As Judge Chasanow has explained, "[t]he application of [the *Johnson*] factors requires varying levels of analysis depending on the circumstances" and "[c]ertain cases do not raise the kind of concerns that might call for an especially robust or detailed explanation of a fee award by a district court." *Erny*, 2020 WL 3639978, at *4 (quotation marks omitted) (citing *Berry*, 807 F.3d at 618). Judge Chasanow also found persuasive "out-of-district authority which

---

absolutely is not. It's an arbitrary calculation, arbitrary but informed by my experience in these matters.").) Plaintiff has not explained why this admittedly arbitrary fee award should inform the size of the appropriate award in this case.

11

supports the common-sense principle that unopposed, negotiated fee awards should be more readily approved." *Id.* (collecting cases); *see also Allred on behalf of Aclaris Therapeutics, Inc. v. Walker*, Civ. No. 19-10641-LJL, 2021 WL 5847405, at *5 (S.D.N.Y. Dec. 9, 2021) ("The few courts that have considered the issue over the years have held that great, and potentially dispositive, weight should be given to a fee amount not to be paid from a common fund negotiated at arm's length between sophisticated counsel after the substantive terms of a settlement have been agreed."). Indeed, the Supreme Court has endorsed the consensual resolution of the amount of attorneys' fees to be paid to plaintiffs' counsel in representative litigation. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee.").

The Court finds that such deference should be accorded in this case given various factors, including the lack of any objection by the parties or by shareholders regarding any aspect of the settlement, including the attorneys' fees; the sophistication of the parties and their counsel; the circumstances surrounding the negotiation of attorneys' fees (namely, that they were agreed upon only after the substantive settlement had been reached, extensive negotiations between the parties, and a double-blind proposal by the mediator); and that the fees are being paid by the Company's insurer rather than out of a common fund that might benefit Omega or its shareholders. *See, e.g., Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001) ("substantial weight" should be given to fee awards negotiated at arms'-length); *Shapiro v. JPMorgan Chase & Co.*, Civ. No. 11-7961-CM, 2014 WL 1224666, at *25 (S.D.N.Y. Mar. 24, 2014) ("That the Attorneys' Fee Payment was later separately negotiated weighs in favor of its reasonableness."); *In re S. Co. Shareholder Derivative Litig.*, Civ. No. 17-725-MHC, 2022 WL 4545614, at *10 (N.D. Ga. June 9, 2022) (explaining that the parties only agreed to a fee amount after "a number of exchanges

through the Mediator" pursuant to a "double-blind proposal" and concluding that "[t]he Mediator's role in the negotiations provides further assurances that the process was fair and the amount reasonable").

### 2. Analysis under *Johnson*

Here, Plaintiff's counsel seeks a total payment of $850,000 (which includes the attorneys' fees, expenses, and the service award for the named Plaintiff). Plaintiff's counsel explains that the total sum of their billable work is $656,147.50, based upon 963.8 hours of work by various attorneys and their respective billing rates. (ECF No. 86-1 at 24, 26.) As counsel explains, "[a]fter deducting Plaintiff's Counsel's total expenses of $17,490.50 . . . and Plaintiff's requested Service Award of $2,000.00 from the requested $850,000.00 Fee and Expense Amount, the net fee award sought by Plaintiff's Counsel is $830,509.50. This represents a multiplier of 1.27 on Plaintiff's Counsel's total lodestar (based on the Brown Law Firm's hourly rates) of $656,147.50[.]" (*Id.*)

The Court has reviewed the record and concludes that the $656,147.50 lodestar figure is appropriate based on a review of the *Johnson* factors. In this circumstance, where the Court accords deference to the parties' negotiated amount, it need not exhaustively review the *Johnson* factors. *See Erny*, 2020 WL 3639978, at *4.

The Court begins with the "most important" *Johnson* factor: the degree of success obtained by the Plaintiff. *Austin v. AT & T Corp.*, Civ. No. JFM-02-1118, 2004 WL 911302, at *1 (D. Md. Apr. 15, 2004). As discussed above, the corporate reforms go to the heart of Plaintiff's claims, and provide immediate and long-lasting benefits. Though the corporate reforms provided in the settlement are non-monetary, they are comprehensive. *See In re AOL Time Warner Shareholder Derivative Litig.*, 2010 WL 363113, at *23 (S.D.N.Y. Feb. 1, 2010) (fee award should incentivize "future counsel to devise remedies as an alternative to money, strengthening corporate America in the long run through innovation and prophylaxis"). This factor supports the lodestar figure.

13

The Court has reviewed the number of hours billed by each attorney at each litigation stage and concludes, based on its experience, that the time and labor required for this matter supports the lodestar figure. (*See* ECF No. 86-3 at 19 (providing the number of hours billed by litigation phase).) The hourly rates here range from $750 to $975 for partners and $375 to $625 for law clerks. (ECF No. 86-3 at 18.) The Court finds that it is appropriate to conduct its analysis utilizing counsel's actual hourly rates, as opposed to the amounts provided in Appendix B of the Local Rules. *See In re Altria Grp., Inc.*, Civ. No. 20-772-DJN, 2023 WL 2116803, at *7 (E.D. Va. Feb. 20, 2023) ("The Court [] accepts the hourly rates charged which, although high for this locality, fall within a reasonable range for complex shareholder derivative actions, where the market for attorneys is nationwide and populated by very experienced attorneys with excellent credentials." (citations and alterations omitted)); (*see also* ECF No. 86-3 at 20–22 (Declaration of Plaintiff's Counsel summarizing other cases wherein similar rates were approved by courts).)

The Court also concludes that the complexity of this case and the experience of counsel weighs in favor of finding that the proposed lodestar is reasonable. As noted above, this case presented novel issues. Further, derivative litigation is complex and requires experience and skill to successfully navigate, and to achieve the corporate reforms achieved in this case. Further, as Plaintiff's counsel explains, this case "prevented the attorneys and their staff from spending their time pursuing other matters[.]" (ECF No. 86-1 at 28.) The Court also takes into account that the work was performed on a contingency basis, and therefore represented a significant risk. *See Erny*, 2020 WL 3639978, at *5 (explaining that "the fact that Plaintiffs' counsel accepted [the] case on a contingency basis" weighed in favor of the reasonableness of the agreed-to fee amount).

The Court does not find that any subtraction of hours is necessary in this case, given the outcome. Further, as noted above, the fee sought by Plaintiff's counsel (exclusive of the expenses

14

of approximately $17,000 and the service award of $2,000) is $830,509.50, which represents a multiplier of 1.27 of the $656,147.50 lodestar amount. The Court finds that this multiplier is reasonable in this case in light of the degree of success obtained in this case and given the multipliers that have been found reasonable in shareholder derivative litigation. *See, e.g., Cohn v. Nelson*, 375 F. Supp. 2d 844, 862 (E.D. Mo. 2005) ("In shareholder litigation, courts typically apply a multiplier of 3 to 5 to compensate counsel for the risk of contingent representation." (collecting cases)).

The Court also finds that the request for $17,490.50 in expenses is reasonable, based upon the breakdown of such fees provided by Plaintiff's counsel. (*See* ECF No. 86-3 at 23.) The Court notes that over $15,000 of the expenses was for mediation fees, and the remaining approximately $2,000 was for travel-related expenses, legal research, and court fees. (*Id.*) This is reasonable.

In short, the Court finds that the requested award of $830,509.50 in fees and $17,490.50 in expenses is reasonable.

### C. Service Award

With respect to the requested $2,000 service award to the Plaintiff, "[t]o determine whether an incentive payment is warranted, a court should consider the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefited from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Erny*, Civ. No. DKC 18-3698, 2020 WL 3639978, at *6 (D. Md. July 6, 2020) (citation and quotations omitted). Further, because the requested service award will be paid out of the $850,000 (as opposed to out of a common fund), "it need not be subject to intensive scrutiny, as the interests of the corporation, the public and the defendants are not directly affected." *Id.* (citations and

quotations omitted). The Court finds that the requested service award reasonable, considering the awards that are routinely granted in derivative actions and the circumstances of this case.

### III. Conclusion

For the foregoing reasons, Plaintiff's Motions (ECF Nos. 85, 86) will be granted. A separate Order follows.

DATED this 8 day of August, 2024.

BY THE COURT:

*/s/ James K. Bredar*
James K. Bredar
United States District Judge